In the Matter of the Accounting of PAUL NEUBERGER, as Ancillary Administrator C. T. A. of LAVOSLAV SIK, Deceased.

Surrogate's Court, New York County, March 8, 1954.

*Samuel Hoffman, Irving Margolies* and *Paul Neuberger,* in person, for Paul Neuberger, as ancillary administrator *c. t. a..* petitioner.

*George Reiss* for Robert Denes, as creditor, respondent.

. COLLINS, S. The single issue in this accounting proceeding is raised by the objection filed by Robert Denes to the rejection of his claim based upon a contract with the decedent. The ancillary administrator *c. t. a.* not only disputes the making of the contract, but in addition asserts that it was illegal and unenforcible.

The decedent and the objectant resided in Zagreb, Yugoslavia. The decedent had been engaged in the practice of law up to the time of the German invasion of Yugoslavia in April, 1941. The objectant was a manufacturer of men's neckwear. Both were members of the Jewish religion and were in immediate danger of persecution at the hands of the invaders and the puppet State created by them. Soon after the German occupation, the decedent's office was taken, and he was placed under arrest, though he was released soon afterwards. He was subjected to black-

mail and coercion and was in need of funds, both for himself and his family. At about the same time, the objectant turned his large stock of merchandise into cash and appears to have made preparations to leave Yugoslavia.

It has been satisfactorily established that from time to time during that period, the decedent borrowed sums of money from the objectant. In November, 1941, the total amount of the loan aggregated 580,000 dinars. The decedent gave to the objectant a written instrument which recited the total amount borrowed up to that time, and promised to pay the objectant in American dollars the equivalent of 580,000 dinars at the rate of 95 dinars to the dollar. Under the terms of the agreement, payment would be made from the decedent's account at Guaranty Trust Company in New York as soon as possible after the war, but in any event not later than three months after the end of the war. The objectant held this instrument for a time, but because he feared arrest and the consequent expropriation of the paper and the claim, he entrusted possession of it to others, the last being his sister. She disappeared during the persecution. The decedent was subsequently arrested again, deported to a concentration camp and presumably died there. The objectant managed to escape arrest and subsequently came to this country.

The evidence clearly establishes the making of the loans and the contract for repayment out of funds here. The ancillary administrator *c. t. a.* contends that such a contract is void because it was in violation of the foreign exchange laws of Yugoslavia. It is not disputed that foreign exchange regulations had been in force and effect in Yugoslavia for a decade prior to 1941, and that these regulations were not substantially changed during the German occupation or immediately thereafter. These regulations prohibited the purchase or sale of foreign exchange and all business transactions in foreign currency or that were to be bound to a foreign currency. Business transactions in Yugoslavia could be concluded only in dinars. There is disagreement between the parties, however, as to whether the exchange regulations were in force in November, 1941, and, even if they remained in full force and effect, whether a contract made in violation of its terms would be valid and enforcible in Yugoslavia.

Objectant's expert on Yugoslavian law testified that although the foreign exchange regulations may have been technically in force because never explicitly repealed, they were inoperative

at the time of this agreement. When the Germans invaded Yugoslavia in April, 1941, the Yugoslav officials left the country and for a time, it is said, the only law was the "law of the Jungle." The decedent and the objectant were members of a religious group then being cruelly persecuted, and, in a practical sense, neither of them had any recourse to the authorities or to the courts. Had they revealed ownership of money, it would have been seized. Indeed, their very lives were in danger. The decedent's bank account had been maintained in New York with the permission of the Yugoslav authorities and in conformity with the law of that country. It seems clear from the evidence that the Minister of Finance of Yugoslavia had authority to grant permission to make payments from such a foreign account. However, the lawful authorities were then in exile, and such permission could not even be sought. To ask an enemy alien or his collaborators for such permission would have courted disaster. Hence, says objectant's expert the regulations were then inoperative.

The estate contends that the regulations during the regime of the puppet State and under the later Yugoslav government were substantially the same as they had been for many years before, and that we must recognize that rule of law as continuing in force and effect when the contract was made. (See *Werfel* v. *Zivnostenska Banka,* 260 App. Div. 747, 750–52, revd. on other grounds, 287 N. Y. 91.)

The experts on foreign law are in sharp disagreement respecting the validity of the agreement even if the exchange regulations remained in full force and effect during this period. Objectant's expert testified that the contract violated the terms of the exchange regulations, but being merely a violation of an administrative regulation, the contract would be valid and enforcible in Yugoslavia. On the other hand, the experts produced by the estate testified that under the law of Yugoslavia in effect in 1941, the contract was absolutely void and that the objectant could not recover upon it in any court in Yugoslavia. The estate's experts conceded, however, that the objectant would not have been without any remedy, because the decedent "enriched himself sina causa because there was no contract, because the contract is *ab initio* null and void", and since the decedent received 580,000 dinars, he would be obligated to repay 580,000 dinars to objectant. Under this theory the estate would not be obligated to repay at the exchange rate fixed in the agreement (95 to the dollar) nor at the rate prevalent when the agree-

ment was made (approximately 50 to the dollar) but only at the current rate of exchange (approximately 300 to the dollar).

The decision on this claim does not depend upon the manner in which it could be enforced in Yugoslavia or as to its validity under the laws of that country. The law which determines the essential validity of a contract is the law which the parties intended to govern it, provided the transaction has some reasonable connection with the place where such law operates. (*Compania Inversiones Internacionales* v. *Industrial Mtge. Bank*, 269 N. Y. 22, 26; *Dougherty* v. *Equitable Life Assur. Soc.*, 266 N. Y. 71, 80; *Kleve* v. *Basler L.-V. Gesellschaft*, 182 Misc. 776, 780; 6 Williston on Contracts, p. 5096, and 62 Harv. L. Rev. 647.) Clearly the parties to this agreement intended the law of New York to govern the transaction. They did not intend to violate the law of the government recognized by them as the lawful government of Yugoslavia. Their country overrun by the enemy, their property subjected to expropriation, their lives in grave danger, they were forced to liquidate assets, use their funds at once and to take steps for their safety. Even the currency of Yugoslavia was being changed so that dinars would no longer have any value. A new unit of currency, called kuna, was being substituted. Neither knew where the end of the war would find him or his family. The decedent was compelled to resort to his New York bank account. The objectant was compelled to liquidate his assets in Yugoslavia, and desired to safeguard the proceeds as far as was possible. The parties had been friends for many years and dealt fairly with each other. The rate of exchange agreed upon was much more favorable to the decedent than the then current rate. They contracted for payment in United States dollars from the New York account and presumably intended payment to be governed by the law which had power and jurisdiction over that account. In the constantly changing pattern of their lives and the ever mounting pressure exerted against them, New York represented to them not only a place where the money would be safely preserved but also the place to which both looked for performance of the agreement.

It is argued that because the United States and Yugoslavia are members of the International Monetary Fund established by the Bretton Woods Agreement Act, we must recognize and uphold the foreign exchange regulations. (See *Perutz* v. *Bohemian Discount Bank in Liquidation*, 304 N. Y. 533, 537.) It is a general rule of law that a bargain, the performance of

which involves a violation of the law of a friendly nation, is illegal. (Restatement, Contracts, § 592; 6 Williston on Contracts, § 1749.) However, the contract made in Yugoslavia would violate the regulations only if it were made without the license from or permission of the Minister of Finance. Even if the regulations were still in effect, it was impossible to make the appropriate application because the authorities were not able to function. Under such circumstances, failure to obtain a license before making the contract does not render the contract unenforcible. (*Meade* v. *Lamarche,* 150 App. Div. 42.) The objectant is no longer a resident of Yugoslavia. The decedent died during the persecution and his estate is under the supervision of this court. It is not necessary now to obtain permission of the foreign government to pay the claim which is valid under our law.

The court, therefore, holds that the claim of the objectant is valid and enforcible and the objectant is entitled to payment in accordance with its terms.

The question of interest on the claim is argued in the briefs on the basis of facts assumed but not in the record. The general rules applicable are stated by Mr. Surrogate FRANKENTHALER in *Matter of De Montale* (N. Y. L. J., Nov. 22, 1950, p. 1285, col. 5). Unless the parties agree upon the amount of interest to be added, the interest on the claim will be reserved for determination upon the settlement of the decree.

Submit decree on notice settling the account accordingly.