INSTITUTO PER LO SVILUPPO ECO-NOMICO DELL' ITALIA MERI-DIONALE, Plaintiff,

v.

SPERTI PRODUCTS, INC., Defendant.

No. 68 Civ. 4667.

United States District Court,
S. D. New York.

Feb. 3, 1971.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for plaintiff; Edward N. Costikyan and Steven P. Dolberg, New York City, of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendant; Edward C. McLean, Jr., New York City, of counsel.

MANSFIELD, District Judge.

In this suit upon a written guaranty, plaintiff has moved pursuant to Rule 56, F.R.C.P., for summary judgment in the sum of 498,400,000 Lire ($207,334.40) with interest from June 30, 1967, together with reasonable attorneys' fees, costs and disbursements. In addition plaintiff seeks reasonable expenses incurred by it as the result of defendant's alleged bad faith opposition to plaintiff's earlier motion for summary judgment. Defendant has cross-moved for summary judgment in its favor, together with the costs and disbursements of this action.

For the reasons stated below, plaintiff's motion is granted except for its claim for reasonable attorneys' fees and disbursements and for expenses arising out of its earlier motion, which is denied. Defendant's motion is denied.

Plaintiff (called "Isveimer" by the parties) is a corporation formed under the auspices of the Italian government. Its purpose is to encourage industrial development in southern Italy. Defendant ("Sperti" herein) is an Ohio corporation having its principal place of business in Kentucky. In 1965 it, together with some other American investors, managed and controlled Societa Azionaria Conservazione Alimenti Freschi ("SACAF"), an Italian corporation engaged in the food-processing business in southern Italy.

On February 8, 1965, plaintiff agreed to loan 500,000,000 Lire ($800,000) to SACAF; and by contract between the parties dated February 8, 1965, defendant guaranteed repayment of that loan to the extent of 26%, or 130,000,000 Lire ($208,000). The loan was carried out to the extent of advances of 498,-400,000 Lire. (Sperti claims that the advances amounted to 491,400,000 Lire, but we hold otherwise for reasons explained below.) SACAF then experienced financial difficulty, which continued until May 1966, when a bankruptcy petition with respect to it was filed in the Court of Salerno, Italy. On June 30, 1967, SACAF wholly defaulted in repaying the loan, and the total amount guaranteed by Sperti became due and owing.

Sperti did not pay, with the result that an action was commenced by plaintiff against it upon the guaranty in the New York State Supreme Court. Sperti was personally served in Kentucky with a Notice of Motion for Summary Judgment in Lieu of a Complaint, pursuant to N.Y.C.P.L.R. § 3213. On November 26, 1968, prior to the return date of the motion for summary judgment in the state court, Sperti removed this action to federal court.

Plaintiff's motion for summary judgment was heard by Judge Edelstein on February 25, 1969. Sperti claimed that it had no evidence in its file that the money had been advanced to SACAF as alleged and also raised several procedural questions. Judge Edelstein dismissed the substantive claim upon plaintiff's documentary proof of the advances, Instituto per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Products, Inc., 47 F.R.D. 310, 316 (S.D.N.Y.1969) (Edelstein, J.), and similarly disposed of all of the procedural objections but one, holding that there was one triable issue

of fact—whether this court had *in personam* jurisdiction over the defendant. *Id.* at 317. That issue depended upon whether or not the cause of action arose out of Sperti's transaction of business in New York, within the meaning of C.P.L.R. § 302(a) (1).[1]

To resolve the issue of jurisdiction Isveimer took various depositions of Sperti officers and counsel, on the basis of which it contends, and we agree, that this court has personal jurisdiction over defendant. Sperti now also agrees that it is amenable to jurisdiction. (Affidavit of Edward C. McLean, Jr., ¶18; Brief of Defendant at 8.) Discovery revealed that the guaranty was executed by Sperti's president in New York and approved at a meeting of Sperti's board of directors, which also took place in New York. Sperti also had a New York office and conducted licensing activities through the law firm of Shea, Gallop, Climenko & Gould (which was in the same building as Sperti, but on a different floor). These contacts are enough [2] to support personal jurisdiction under C.P.L.R. § 302(a) (1). E. g., Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951 (2d Cir. 1967); Winston, Inc. v. Waldfogel, 292 F.Supp. 473 (S.D.N.Y.1968); Atlantic Steamers Supply Co. v. International Maritime Supplies Co., Ltd., 268 F.Supp. 1009 (S.D.N.Y.1967); Potter's Photographic Applications Co. v. Ealing Corp., 292 F.Supp. 92, 100–103 (E.D.N.Y.1968).

Since Judge Edelstein held that jurisdiction remained an open issue, his respected comments regarding ultimate liability and damages did not constitute a holding. United States v. Montreal Trust Co., 358 F.2d 239, 249 (2d Cir.), cert. denied, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966); Arrowsmith v. United Press International, 320 F.2d 219, 221 (2d Cir. 1963) (en banc). We must therefore now decide these issues.

The first issue concerns the amount of money advanced by plaintiff to SACAF. Plaintiff contends that of the 500 million Lire that it agreed to loan to SACAF it advanced 498.4 million Lire by directing the Banco di Napoli to make that amount available to Sperti. The records of that bank, maintained in the regular course of business, show payment of 498.4 million Lire under the SACAF loan agreement. Sperti, however, points out that although plaintiff directed the bank to forward that amount to SACAF, the bank only advanced 491.4 million Lire. The discrepancy occurred because the bank credited itself with 7 million Lire in payment of interest due it from SACAF on an unrelated loan.

There is no contention that SACAF was not indebted to the bank for interest in the sum of 7 million Lire at the time when the bank applied that amount of the loan to reduction of SACAF's indebtedness to it. Thus SACAF had the benefit of 7 million Lire, albeit in the form of a reduction of its indebtedness to the bank rather than through use of the funds for some other purpose. As far as plaintiff was concerned, it made the money available to SACAF and it was not under an obligation to see that the funds were applied toward one use rather than the other as long as they were credited to SACAF's account.

It was known by both SACAF and Isveimer that SACAF had maintained a credit and debit account with the Banco di Napoli in Salerno. (Deposition of Mario Giordano (the director-general of

---

1. The New York C.P.L.R. § 302(a) (1) states:

   "(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent:

   1. transacts any business within the state; or * * *."

2. Sperti also had bank accounts in New York, underwriters in this state, and wholly-owned subsidiaries in New York. But the present lawsuit did not arise out of these activities.

Isveimer) at 77.) The bank, in making its attachment, was no agent of Isveimer.[3] And the bank confirmed to Isveimer that the loan installment (including the disputed 7 million Lire) had been paid. Thus, any informal attachment or "garnishment" by the bank of Isveimer's loan to SACAF does not work to the advantage of SACAF and Sperti. Accordingly, we conclude that SACAF received the advance of 7 million Lire and became indebted for it to plaintiff.

Sperti argues that under § 1955 of the Italian Civil Code its obligations to Isveimer upon the guaranty have been discharged; alternatively, it argues that under § 1275 of the Italian Civil Code Sperti's obligations to Isveimer have been reduced by about 50%. We shall consider, first, the undisputed factual background relied upon by Sperti, and then the legal arguments themselves.

Prior to 1965 Isveimer made four loans to SACAF, each of which was secured by a separate mortgage of the SACAF factory at Fuorni, Italy, and by a separate privilege on the machinery installed in that factory. A "privilege" is a lien on personalty which is authorized by statute. Each privilege and mortgage was duly recorded. (Tesauro Aff. of March 5, 1970, ¶8.) Each of the loans contained an after-acquired property clause, translated as follows:

"The mortgage and the privilege, allowed as stated before, are extended to all fittings, furniture, dominant servitutes (jure in re), new constructions, as well as to all the plants, machinery and equipments, even if not described in the present contract, and even if brought into the mortgaged premises at a subsequent time."

On February 8, 1965, SACAF obtained from Isveimer a fifth loan of 500 million Lire, which is the loan partially guaranteed under the terms of the guaranty forming the basis of the present suit. This fifth loan was obtained "in order to improve the citrus fruit processing department" of the Fuorni factory. (Loan Agreement, Ex. A at 5 of Bisconti Aff. (in Italian); Ex. B at 5 (in English)). Under the guaranty agreement between Sperti and Isveimer, which is reprinted below,[4] Sperti guar-

---

3. It is also not irrelevant that the Italian Bankruptcy Court adjudicated that Isveimer did advance loans to the extent of 498,400,000 Lire.

4. The Guaranty reads as follows:
"The undersigned, E. L. DITTRICH, as President of SPERTI PRODUCTS, INC., situated in Cincinnati, Hamilton County, Ohio, in the name and on behalf of such corporation, hereby jointly and severally guarantees, for such corporation and for its successors and assigns for the benefit of SOCIETA AZIONARIA CONSERVAZIONE ALIMENTI FRESCHI, S.A.C.A.F., S.p.A. —situated in Fuorni, Salerno, to the said Instituto, the payment of the amount of a lire 500,000,000 loan granted by said Instituto to the said S.A.C.A.F. pursuant to an agreement dated February 8, 1965, made in the presence of Notary Francesco Costa of Naples, including the relative interest, arrears, and all other expenses, and also the reimbursement of insurance premiums paid by the said Instituto on behalf of the borrower company, as per Article 2 of the specifications attached to the loan contract, and the payment of the legal expenses, as well as all obligations assumed by the borrower company thereunder. The undersigned accepts all the provisions of the loan contract without exception, and declares that he had full and complete knowledge of the loan contract, having seen and read the same.
"This guarantee is limited to 26% of the loan.
"The guarantee as above granted, will always remain firm and legally valid, and there will be no need of further anticipation or declarations by the guaranteeing company, even if ISVEIMER, following the execution of this contract, grants reductions of the amount loaned or postponements—for any length of time—of the relative dates of the advances, as well as changes and postponements for any length of time of the dates of payment and of maturity of some or all the loan installments, and of the relative pre-amortization interest, even by increasing or reducing their number and the consequent variation of their amounts, the guarantor waives, particularly, the terms of release contained in Article 1957 C.C., as well as

anteed repayment of 26% of the 500 million Lire loan granted by Isveimer to SACAF. The guaranty also specifically provides that Sperti's president, on its behalf, "accepts all the provisions of the loan contract without exception, and declares that he has full and complete knowledge of the loan contract, having seen and read the same." The final paragraph of the guaranty defines Sperti's subrogation rights, providing that if Sperti should be called upon to make payments to Isveimer thereunder Sperti would be subrogated to the rights of Isveimer against SACAF, subject to Isveimer's retaining priority over Sperti as against SACAF *until Isveimer would be repaid the fifth loan*. In other words, defendant's subrogation rights were not to become effective until plaintiff was repaid in full.

Following the fifth loan SACAF suffered severe economic difficulties and in 1966 a petition in bankruptcy was filed against it in the Tribunali di Salerno. The Bankruptcy Court recognized Isveimer as having a preferred claim over all other creditors (except for the credits and expenses of the bankruptcy proceeding) in the amount of 1,940,540,410 Lire, plus interest. This sum represented the aggregate of the amounts then owed by SACAF to Isveimer on the four prior loans, which were *not* guaranteed by Sperti, and on the fifth loan, which *was* guaranteed by Sperti, plus interest.

Prior to 1969 the Bankruptcy Court made two unsuccessful attempts to sell SACAF's assets at auction. Then, on February 5, 1969, it ordered the sale of SACAF's assets, without auction, to the highest bidder willing to meet a minimum price of 1,054,460,390 Lire, plus the expenses of the bankruptcy proceed-

ing. The February 5th order provided that the purchaser could either (1) pay the full purchase price into the Bankruptcy Court within 30 days after purchase; or (2) pay 10 million Lire into the court and agree with Isveimer to assume SACAF's indebtedness to Isveimer to the extent of 1,044,460,390 Lire just as if the purchaser had paid such amount as part of the purchase price, which would have "the effect of immediately discharging the bankrupt company" of its obligations to Isveimer. (Ex. F, Bisconti Aff., May 31, 1970 (English translation) ).

Doro Italiana, S.p.A. ("Doro" herein), which had been operating the SACAF plant under a lease from the Receiver in Bankruptcy, submitted a bid for the SACAF assets. It must have come as no surprise that Doro chose the second of the alternative methods of payment prescribed by the Bankruptcy Court. Isveimer and Doro, by agreement dated June 12, 1969, contracted that Doro would assume SACAF's indebtedness to Isveimer to the extent of 1,044,460,390 Lire and pay this amount plus interest to Isveimer in six yearly installments beginning July 1, 1970. It was agreed that the six-year payment schedule would replace the schedules contained in the series of five loan agreements between plaintiff and SACAF. Though Isveimer has not yet received all of the payments from Doro, we assume for purposes of this motion that Doro will pay its debt in full.

Assuming that the 1.044 billion Lire are paid in full to Isveimer, it will not thereby be made whole, since SACAF's total debt to it was 1,940,540,410 Lire, of which 498.4 million arose out of the fifth loan, which is the one guaranteed

---

in the event that ISVEIMER consents to the reduction or release from the guarantee contained in this contract, or otherwise granted, while ISVEIMER shall have no obligation to give notice of any of the foregoing to the guarantor.

"In the event that partial payments of the loan are made by the guarantor, every subsequent right of subroga-

tion of such guarantor to the rights and guarantees of ISVEIMER can only be effective, in the case of conflict, if any right of priority of ISVEIMER remains in full force and effect, so that any remaining amount owed to ISVEIMER is first paid and any amount owed to the guarantor is paid thereafter."

by defendant Sperti. Under the terms of the June 12th agreement Isveimer also retained its rights under Sperti's guaranty: "In addition, ISVEIMER['s] right to recover the whole credit against the bankruptcy of SACAF, S.p.A., its suretyship and third givers of mortgages for the remaining credit, which will not be included in the final allotment, remains unaltered." (Ex. K of Bisconti Aff. at 15–16 (English translation) ).

In July 1969 the Bankruptcy Court transferred the SACAF assets to Doro in consideration of its assuming the obligations undertaken by it under the June 12 agreement, and directed the cancellation of all of the mortgages and liens held by plaintiff on the SACAF property.

Section 1955 of the Italian Civil Code provides: [5]

> "Release of surety caused by creditor. Suretyship is extinguished when the subrogation of the surety to the rights, pledges, and mortgages and privileges of the creditor has become impossible because of actions of the creditor."

Sperti's legal argument, based upon the opinion of Dr. Guiseppi Bisconti, is that "the *voluntary* act of Isveimer in entering into the Agreement of June 12, 1969 with Doro", which preceded the Bankruptcy Order of July 24, 1969, cancelling all mortgages and liens on what had been the SACAF property except the lien agreed to between Isveimer and Doro, extinguished Sperti's guaranty under § 1955. (Bisconti Aff. of May 19, 1970, ¶24 (emphasis added)). Isveimer replies, upon the basis of the legal opinion of its counsel, that there was no voluntary act on the part of Isveimer but an act ordered by the Bankruptcy Court (Teasuro Aff. of Aug. 14, 1970, ¶11), to which Dr. Bisconti responds: "Under Italian law a distinction between voluntary and involuntary acts of the

creditor does not exist." (Bisconti Aff. of Oct. 2, 1970, ¶2).

█ Thus we are presented with a question of foreign law which since 1966 may be decided by us as a question of law rather than of fact pursuant to Rule 44.1, F.R.C.P., which provides "the court's determination shall be treated as a ruling on a question of law." We believe that the question presented here can appropriately be decided upon this motion for summary judgment. Bamberger v. Clark, 129 U.S.App.D.C. 70, 390 F.2d 485 (1968). In Italy, also, it had been the rule that questions of foreign law were questions of fact (*quaestiones facti*). But Zaffarano v. DiMonte, Cassation, II Civil Section, April 13, 1959, No. 1089, published, e. g., in *Riv.Dir.Int.*, 1959, 620 *ff.*, began to change that rule, and now it is clear that an Italian judge treats questions of foreign law as questions of law in which he has the power and the duty to inform himself of the applicable law. Finaly v. Bounin, Cassation, II Civil Section, Feb. 16, 1966, No. 486, published, e. g., in *Guir, It.*, 1966, I, 1, c. 1401.

Turning to the question of law thus presented, we believe that great as is our respect for Dr. Bisconti as one of Italy's most distinguished legal experts, whose reputation extends beyond its borders, Isveimer has the better of this argument. We find no support, either in treatises, statutes or logic, for the proposition that a creditor's action pursuant to court order (such as Isveimer's conduct here) constitutes "actions" of the type referred to in § 1955. The latter was clearly intended to govern the *voluntary* conduct of a creditor, not actions performed pursuant to court order. We are therefore persuaded by the opinion and analysis of Dr. Paolo Tesauro to the effect that § 1955 has no application to the facts of this case.

Under Italian law creditors have no power to make arrangements for the cancellation of liens or the sale of a

---

5. Translated in M. Beltramo, G. Longo, & J. Merryman, The Italian Civil Code 484 (1969) (cross-references to other sections have been omitted).

bankrupt's property. That power is vested solely in the Bankruptcy Court. Thus it is clear that if, indeed, there had been any extinction of Sperti's subrogation rights against the bankrupt, which we do not believe was the case here, the proximate cause would have been SACAF's bankruptcy and the action of the Italian Bankruptcy Court, which had control over the bankrupt and its property, rather than the conduct of Isveimer.

It was the Bankruptcy Court, exercising its powers under Italian law, that prescribed the two alternative methods of payment to be employed in order to effectuate the sale of the bankrupt's assets. Sperti concedes that one of these alternatives—payment of cash for the bankrupt's assets and distribution of the cash to Isveimer as the preferred creditor—was permitted under Italian law and would not have extinguished the guaranty. We fail to see any logic to the argument that because the parties used the other method of payment prescribed by the court, § 1955 could be invoked to deny Isveimer its rights against Sperti. The use of one method rather than the other did not increase Sperti's opportunity to recoup any payment made by it upon its guaranty. The undisputed fact is that SACAF is bankrupt, without even sufficient assets to pay the preferred creditor, Isveimer, and that under Sperti's guaranty Isveimer would have to be paid in full before Sperti could exercise its rights of subrogation. Thus, with the cupboard bare, Isveimer has done nothing to destroy Sperti's subrogation rights against SACAF.

Our view also appears to find some support in one of the holdings of the Italian Court of Cassation in Contardi Edoardo, et al. v. Maccio' Leo, et al., Cassation, I Civil Section, July 11, 1967, No. 1712 (reprinted in Ex. C. to Bisconti Aff. of Oct. 2, 1970 (in Italian), and translated in part in Ex. D to Bisconti Aff. of Oct. 2, 1970). There it was contended that under § 1955 a creditor's conduct in accepting payment of a bankrupt's debt from some guarantors extinguished the subrogation rights of co-guarantors and thereby discharged their obligation to contribute toward payment of the debt. Since there, as here, no prejudice to the guarantors' subrogation rights resulted from the creditor's conduct, the court held that § 1955 did not apply. While we are not bound, under Italian practice, by the *Edoardo* case,[6] we are entitled to consider it in reaching our conclusion that § 1955 did not release Sperti of its obligations under its guarantee.

Sperti's second contention is based on § 1275 of the Italian Civil Code, which provides:[7]

"Extinguishment of guarantees. In all cases in which the creditor releases the original debtor, all guarantees attached to the claim are extinguished, unless the person who furnished them agrees specifically to continue them."

Sperti's argument is that Doro's agreement to assume and pay 1,044,460,-390 Lire of SACAF's debt to Isveimer resulted in the latter, a creditor, releasing

---

6. Basically precedent is not binding in Italian law. Historically there has been a distrust of the judiciary and the resultant attitude has been that lawmaking —which is a product of precedent—should not be practiced by the judges. Moreover, even the informal application of *stare decisis* is difficult, and dangerous, because there is only a scanty, abstract statement of facts published with each case decided by the Supreme Court of Cessation. However, times are changing and feelings toward the separation of powers are becoming more flexible. Cases and *massime* (headnotes) do have persuasive authority. E. g., M. Cappelletii, J. Merryman & J. Perillo, The Italian Legal System 247, 252, 273–77 (1967); M. Cappelletti & J. Perillo, Civil Procedure in Italy 49 (1965). But see, Rotondi, Interpretazione della legge, 8 Novissimo Digesto Italiano 893, 897 (1962) (precedent is not binding).

7. Translated in M. Beltramo, G. Long & J. Merryman, The Italian Civil Code 334 (1969) (cross-references to other sections have been omitted).

SACAF, the original debtor, and thus released Sperti, as guarantor, to the extent of approximately 50% of Sperti's liability to Isveimer—1,044,460,390 Lire being almost 50% of SACAF's total adjudicated debt to Isveimer of 1,940,540,-410 Lire.

This contention must be rejected for at least two reasons. In the first place it was the order of the Bankruptcy Court, not the act of Isveimer as creditor, that released SACAF. It is true that on June 12, 1969, Doro entered into a formal written agreement with Isveimer whereby Doro agreed to buy the bankrupt SACAF's plant and equipment and to assume 1,044,460,390 Lire of SACAF's debt to Isveimer, by paying that amount plus interest in six annual installments to Isveimer, with a new payment schedule to replace the schedules in the original five loan agreements between SACAF and Isveimer. Furthermore, under the new agreement Doro's obligation was to be secured by a lien on all of the property being purchased by it from the bankrupt. However, as the June 12th agreement itself recites, SACAF had on May 11, 1966, been declared bankrupt by the Salerno Court, and the bankrupt's property had by the Bankruptcy Court's order dated April 16, 1969, been assigned without auction to Doro for 1,054,460,390 Lire. Furthermore, the agreement was executed only after the Bankruptcy Court, by order dated February 5, 1969, had expressly authorized Isveimer to enter into such an agreement with the assignee for a total off-auction price of 1,054,460,-390 Lire, after the court's attempts to sell the SACAF assets at auction had been unsuccessful and after it appeared that Isveimer would, as the preferred creditor, be entitled to receive the entire amount to be paid by the assignee. On February 16, 1969, the Bankruptcy Court officially published the proposed terms for the off-auction sale. By order dated March 15, 1969, it acknowledged Doro's offer. Finally, by order dated July 24, 1969, the Bankruptcy Court approved the sale, directing the cancellation of all prior mortgages and

liens held by Isveimer. From this history it is clear that SACAF, being under the jurisdiction of the Bankruptcy Court since 1966, could only be released and discharged by order of that court, and that Isveimer was merely following a procedure initiated and prescribed by the court. Section 1275, therefore, does not apply.

The inapplicability of § 1275 to releases ordered or authorized by a bankruptcy court is further demonstrated by the fact that Sperti's interpretation would have the effect of nullifying a guaranty under the very circumstances where it is most needed and intended to become effective, i.e., the bankruptcy of the debtor and failure of the estate to pay the debtors' obligations in full. The essential purpose of a guaranty is to protect against the debtor's becoming bankrupt or otherwise unable to pay his debts. If a creditor, by accepting a final partial distribution of the debtor's assets from the Bankruptcy Court, and consenting to the debtor's discharge, forfeited his rights to collect the balance from the guarantor, the guaranty would become a meaningless instrument. It is no answer to suggest that a creditor, like Isveimer, can under such circumstances secure the consent of the guarantor. In the first place the guarantor, not being a party to the bankruptcy proceeding, cannot be ordered by it to consent, and on a more practical level the guarantor would have no interest or incentive to do so. Yet the court has the power to order the creditor to give a release as a condition to its receiving a distribution. Thus it is apparent that § 1275 was not intended to apply to releases given by a creditor under the order or aegis of the Bankruptcy Court.

Sperti's argument based on § 1275 must be rejected for the further reason that even if that Article were applicable to the extent of the amount of SACAF's indebtedness assumed by Doro (1,044,-460,390 Lire), the amount thus assumed was insufficient to reduce the balance payable by Sperti on its guaranty of 26% of the fifth loan. The undisputed fact is that prior to the loan and guar-

anty in question, which was the fifth loan, Isveimer had in 1965 made a series of four successive separate loans to SACAF, each secured by a separate first mortgage and privilege, with each mortgage containing an after-acquired property clause. The total of these prior secured loans was in excess of 1.4 billion Lire, as against Doro's assumption of less than 1.1 billion Lire. Thus, even if the entire amount assumed by Doro is paid, no part of the payment will be applied toward the fifth mortgage guaranteed by Sperti.

Sperti seeks to avoid this troublesome fact by arguing that all five loans have been merged into one and that payment towards any must be apportioned among the five. In support of this argument, it points out that the Bankruptcy Court's orders of February 5, 1969, and July 24, 1969, did not specify how the assumption by Doro should be apportioned among the five Isveimer loans; and that the June 12, 1969, agreement between Doro and Isveimer refers to all five loans. The latter agreement, however, neither states nor implies that the parties or the Bankruptcy Court intended the five discrete loans to be merged. Each loan is described separately, and the guaranty by Sperti and others of the fifth loan is specifically described.

There is not the slightest vestige of any intention on the part of the parties or the court to merge the five loans. It would be extraordinary indeed for the holder of a prior first mortgage, with an after-acquired property clause, either to agree in advance to allow the debtor to dilute his priority or, upon the debtor's becoming bankrupt, to waive that priority to the extent of sharing it with later lenders. Such an agreement would have to be expressed. No such terms are found here. On the contrary Isveimer's insistence upon a 100% guarantee of the fifth loan is inconsistent with such an intent, and Sperti offers no logic to support its contention that the loans were merged. Contardi Edoardo, et al. v.

Maxios Leo, et al., *supra*, cited by Sperti, does not support the thesis that the proceeds from sale of a bankrupt's assets must be applied pro rata to satisfaction of successive loans, regardless of the fact that some creditors have prior liens on the assets sold. In that case the court merely held that the purchaser's assumption of part of a bankrupt's indebtedness discharged the amount of the indebtedness assumed, a proposition which Isveimer does not dispute. The court, however, did not reach the question of proportionate discharge of successive loans or proportionate discharge of a guarantor's liability upon his guaranty of a subordinate loan.

In any event Sperti's contention based on Article 1275 would not enable it to avoid payment upon its guaranty, since it guaranteed only 26% of the fifth loan and, even if a pro rata share of Doro's assumption were applied toward reduction of that loan, far more than 26% would remain unpaid. In the absence of a provision in the guaranty to the effect that partial payment of the fifth loan releases Sperti proportionately, it remains liable on its guaranty up to 26% of that loan.

As we stated earlier, plaintiff's first motion for summary judgment was denied because there was a triable issue as to whether this court had *in personam* jurisdiction over the defendant. Instituto per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Products, Inc., 47 F.R.D. 310, 317 (S.D.N.Y.1969). In opposition to this motion Sperti submitted two affidavits, one by its counsel and the other by J. A. Coleman, President and Treasurer of defendant. Plaintiff Isveimer contends that the Coleman affidavit engaged in "deliberate deception of this Court" which led to denial of plaintiff's motion, and seeks an order requiring defendant to reimburse it for the substantial expenses incurred because of this affidavit under Rule 56(g), F.R.C.P.[8]

8. Rule 56(g), F.R.C.P.:
"Affidavit Made in Bad Faith. Should it appear to the satisfaction of

the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely

After reviewing the detailed affidavits submitted by the parties on the question, we are not persuaded that the Coleman affidavit of January 10, 1969, was "presented in bad faith or solely for the purpose of delay," Rule 56(g), F. R.C.P. At worst they appear to have resulted from a complete change in Sperti's management after the events forming the basis of the lawsuit, with some negligence on the part of the new management in obtaining and checking information furnished by it. Indeed some of the mis-information does not appear to have related to matters of significance. For instance, the affidavit stated that Sperti "has done no manufacturing or selling, but has wholly-owned subsidiaries which engage in such operations at a plant located in South Forth Mitchell, Kentucky." (p. 2). Plaintiff complains that that statement is untrue to the extent that it implies that Sperti's wholly-owned subsidiaries operated only in Kentucky. Plaintiff contends that two subsidiaries—Juice Corporation of America and International Hormones, Inc.—have offices in Long Island, and International Hormones also maintains a plant there, and did in 1965 when the guaranty contract was made.

Mr. Coleman, however, in a new affidavit of May 31, 1970, ¶ 8, replies that at the time the suit was instituted neither company was a wholly-owned subsidiary of defendant. But whether or not the Coleman affidavit was in this respect candid, the more important fact to us is that neither subsidiary (International Hormones, Inc. was really a wholly-owned subsidiary of Sperti Drug Company, of which only 38% was owned by defendant) had anything to do with the transactions of this lawsuit. Since the issue was whether long-arm jurisdiction could be sustained on the theory that the claim arose out of transaction of business in New York, see N.Y.C.P.

L.R. § 302(a), the earlier statement would not form a sufficient basis for an award of expenses under Rule 56(g).

In asserting that Coleman deliberately misstated and concealed certain facts, such as the defendant's execution of the guaranty in New York, its lack of knowledge of plaintiff's making of advances to SACAF, etc., plaintiff itself has been guilty of applying the standard of hindsight resulting from depositions and discovery that uncovered information not known to Coleman when he executed the January 1969 affidavit. It must be remembered that he became President-Treasurer and a director of defendant in June 1967, long after the 1965 guaranty had been executed. When this action was commenced in October 1968 he instituted a review of defendant's minutes and files. However, the files had been poorly organized and because they were scattered in different locations, some of them could not be located for a long time. As a result, based upon the records then available to him he furnished some information that has turned out to be incorrect. His original affidavit, for instance, stated that defendant "has no office in New York City, and *I am informed* that the address '41 E. 42nd Street' [the address on defendant's letterhead on which the guaranty was written], was the address at which former attorneys for the defendant had their office." (Aff. at p. 2 (emphasis added)). Later investigation revealed the defendant had a separate office in the same building as its counsel at 41 East 42nd Street, and that Coleman was jumping to conclusions in assuming that the office was part of the suite occupied by defendant's counsel, Shea, Gallop, Climenko & Gould. This error is hardly surprising since Mr. Shea was Chairman of defendant's Board of Directors, Mr. DeGenaro, also a member of the Shea, Gallop firm, was

---

for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused

him to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt."

**640**

Secretary, and the firm itself was Sperti's counsel. Although it was negligent not to have verified the true facts (which also could easily have been verified by plaintiff), the misstatement hardly amounts to bad faith.

It further appears that it was only after depositioning of two of defendant's former officers that defendant was able to obtain accurate information as to the place where the guaranty was executed and as to some of the other jurisdictional facts later relied upon by plaintiff. Under all of the circumstances we find that plaintiff has failed to make a sufficient showing of bad faith to warrant the assessment of expenses and attorneys' fees pursuant to Rule 56(g), F.R.C.P.

For the foregoing reasons plaintiff's motion is granted, except for its claim for expenses, and defendant's motion is denied.

It is so ordered.