COMPANIA DE INVERSIONES INTERNACIONALES, Appellant, *v.* INDUSTRIAL MORTGAGE BANK OF FINLAND, Respondent.

(Argued October 7, 1935; decided November 19, 1935.)

*Phanor J. Eder* and *Frank Rashap,* for appellant. The joint resolution (48 U. S. Stat. 112) does not extend to favor foreign debtors or to foreign creditors or to international transactions. Legal tender acts in derogation of the common law are strictly construed. (*Shotwell* v. *Denham,* 1 N. J. L. 174; *Bronson* v. *Rodes,* 7 Wall. [U. S.] 229; *Trebilcock* v. *Wilson,* 12 Wall. [U. S.] 687; *Lane County* v. *Oregon,* 74 U. S. 71; *Hagar* v. *Reclamation District,* 111 U. S. 701; *Clarke* v. *Nevada Land & Mining Co.,* 6 Nev. 203; *Frank* v. *Calhoun,* 59 Penn. St. 381; *Matter of Carnegie Trust Co.,* 151 App. Div. 606; 206 N. Y. 390; *Psota* v. *Long Island R. R. Co.,* 246 N. Y. 388; *Addiss* v. *Selig,* 264 N. Y. 274; *Feiber Realty Corp.* v. *Abel,* 265 N. Y. 94; *Norman* v. *B. & O. R. R. Co.,* 294 U. S. 240.) Currency statutes specifically have no extraterritorial effect. (*Du Costa and Cole,* 1 Skinner, 272; *Emperor of Austria* v. *Day,* 3 De Gex, F. & F. 217; *Page* v. *Pendleton,* Wythe [Va.], 177; *Searight* v. *Calbraith,* 4 U. S. 325; *Gladstone* v. *Chamberlain,* 10 Fed. Cas. No. 5471.) The situs of a debt for general legal purposes is the domicile of the creditor. (*State Tax on Foreign Held Bonds,* 15 Wall. [U. S.] 300; *Murray* v. *Charleston,* 96 U. S. 432; *Kirtland* v. *Hotchkiss,* 100 U. S. 491; *Beidler* v. *South Carolina,* 282 U. S. 1; *City of New York* v. *McLean,* 170 N. Y. 374; *Baldwin* v. *Missouri,* 281 U. S. 586; *Buck* v. *Beach,* 206 U. S. 392; *City Bank Farmers Trust Co.* v.

*Schnader*, 8 Fed. Supp. 815.) The general rule that payment is governed by the law of the place of payment does not help the defendant. That the bonds are payable here is not a material element. (*Stumpf* v. *Hallahan*, 101 App. Div. 383; *Levy* v. *Cleveland, C., C. & St. Louis R. R. Co.*, 210 App. Div. 422; *Searight* v. *Galbraith*, 4 U. S. 325; *Union Nat. Bank* v. *Chapman*, 169 N. Y. 538; *Gregory* v. *Morris*, 96 U. S. 619; *United States* v. *Erie Ry. Co.*, 106 U. S. 327; 107 U. S. 1.)

*John J. Scott, Albridge C. Smith, Prescott R. Andrews* and *William G. Botzow* for respondent. The bonds are subject to the laws of the United States and the performance of their obligations is regulated thereby. (*Marshall* v. *Sherman*, 148 N. Y. 9.) The parties intended the law of the United States to be the law of their contract. (*Wilson* v. *Lewiston Mill Co.*, 150 N. Y. 314; *Stumpf* v. *Hallahan*, 101 App. Div. 383; 185 N. Y. 550; *Grand* v. *Livingston*, 4 App. Div. 589; 158 N. Y. 688; *Vander Horst* v. *Kittredge*, 229 App. Div. 126.) The place of contracting and the place of performance of the bonds are in the United States. (*Graham* v. *First Nat. Bank*, 84 N. Y. 393; *Richards & Co.* v. *Wreschner*, 174 App. Div. 484; *Curtiss* v. *Leavitt*, 15 N. Y. 2; *Hyde* v. *Goodnow*, 3 N. Y. 266; *Lee* v. *Selleck*, 33 N. Y. 615; *Staples* v. *Nott*, 128 N. Y. 403; *Colonial Nat. Bank* v. *Duerr*, 108 App. Div. 215; *Smith* v. *Dixon*, 150 App. Div. 571; *Thorp* v. *Keokuk Coal Co.*, 48 N. Y. 253; *Lessler* v. *De Loynes*, 150 App. Div. 868; *Hayes* v. *Ammon*, 85 N. Y. Supp. 607.) The joint resolution applies to the obligations of the defendant. *Norman* v. *B. & O. R. R. Co.*, 294 U. S. 240; *Hamilton* v. *Rathbone*, 175 U. S. 414; *Lake County* v. *Rollins*, 130 U. S. 662; *Price* v. *Forrest*, 173 U. S. 410; *Johnson* v. *Southern Pac. R. R. Co.*, 196 U. S. 1; *Bronson* v. *Rodes*, 7 Wall. [U. S.] 229; *First Nat. Bank* v. *United States*, 206 Fed. Rep. 374; *United States* v. *Herron*, 87 U. S. 251; *Savings Bank* v. *United States*, 86 U. S. 227; *United States* v. *Hoar*, 2 Mason, 311; *Pine Hill Coal Co.* v. *United States*,

259 U. S. 191; *California Iron Yards Co.* v. *Commissioner*, 47 Fed. Rep. [2d] 514.)

FINCH, J.   The plaintiff appeals from a judgment of the Appellate Division, unanimously affirming a judgment denying the motion of the plaintiff for judgment on the pleadings in the sum of $5,307.99, with interest, and instead awarding judgment to the plaintiff for the sum of $3,135, without interest.   The amount of the judgment had been tendered to the plaintiff by the defendant prior to the commencement of this action, but the plaintiff refused to surrender its bearer bonds on its part for this amount, and for this reason the judgment granted costs and disbursements to the defendant.

This appeal involves the question whether the joint resolution of the Congress (48 U. S. Stat. 112), which in broad terms nullifies clauses in contracts requiring payment in gold of a certain standard of weight and fineness, applies to an action on a foreign bond requiring such payment, issued and payable in dollars in the United States, where both plaintiff creditor and defendant debtor are non-residents of the United States.

The plaintiff, a foreign corporation domiciled in South America, brought this action to recover the sum of $5,307.99, with interest, by reason of its ownership and possession of three $1,000 first mortgage collateral seven per cent sinking fund gold bonds of the Industrial Mortgage Bank of Finland, a foreign corporation domiciled in Finland, the defendant herein.   The bonds are bearer bonds and payment is promised " in gold coin of the United States of America of the standard of weight and fineness as it existed on July 1, 1924."   These bonds were issued in New York by the defendant and first became valid obligations in the hands of Lee, Higginson & Co., a domestic copartnership, paying agents of the defendant, pursuant to a trust agreement made between the defendant and the New York Trust Company, in the borough

of Manhattan, city and State of New York. Both the principal and interest of these bonds are payable at the office of Lee, Higginson & Co., in the borough of Manhattan, city of New York, or at other specified places in the United States. The defendant has exercised its option to redeem these bonds at 101 on an interest day, namely, July 1, 1934. The bonds are guaranteed by the government of Finland but this action is not against the guarantor.

The contract was made in New York and the bonds are payable and the entire performance of the contract is to take place in the United States. If no other intention is revealed, it must be taken that it was intended by the parties that United States law should be applicable to this contract. The intention of the parties, express or implied, generally determines the law that governs a contract. (*Wilson* v. *Lewiston Mill Co.*, 150 N. Y. 314; *Vander Horst* v. *Kittredge*, 229 App. Div. 126, 132. Cf. *Sokoloff* v. *National City Bank*, 239 N. Y. 171.) Moreover, in the absence of a revealed intention, if a contract is made and is to be performed in the same place, it is held that the law of that place governs. (*Benton* v. *Safe Deposit Bank*, 255 N. Y. 260; *Hutchinson* v. *Ward*, 192 N. Y. 375. See *Curtis* v. *Leavitt*, 15 N. Y. 2, 227.) True it is that the applicable substantive law is that existing at the time the contract is entered into, but where a constitutional law has been enacted subsequently, such law if announcing a public policy and intended to apply by the Congress, is also applicable to the contract.

Although we find that New York or United States law is applicable generally to this contract, we must consider the effect of the provision of the contract fixing a definite standard or measure of value in an attempt to prevent a depreciation in payment as a result of any national law devaluing the dollar.

We are thus brought directly to the question of the applicability of the joint resolution of the Congress to this

controversy.  In passing, it is to be noted that this action is not concerned with sovereigns but with individuals. A foreign, private corporation of Colombia is suing a foreign private corporation of Finland.  The defendant bank is a private institution, and not a governmental agency.  The fact that the government of Finland guarantees the bonds is immaterial here, since the suit is being brought against the defendant bank, the principal obligor, and not against the guarantor.

At the outset, when the obligation of the bonds in suit was created it was then sanctioned by law, subject, however, to the power of the Congress to withdraw a part of that sanction pursuant to its power to regulate the monetary system.  (*Norman* v. *B. & O. R. R. Co.*, 294 U. S. 240.)  If the claim of the plaintiff succeeds, the effect is to subject a citizen to such power of the Congress but to exempt a foreign debtor.  The latter may disclaim the application of the joint resolution but this right is denied to a domestic debtor.  Also, to the extent that the plaintiff succeeds, it means to that extent there is here created a dual monetary system.  If such result was within the power of the Congress to avoid, then its failure so to do appears unreasonable.

We are, therefore, only concerned with whether the Congress possessed the power to make and intended the joint resolution to bring within its terms the obligations at bar.  Was the congressional intention to leave open for enforcement in our courts to foreign debtors the privilege of borrowing money and guaranteeing a fixed repayment against the dangers of inflation, while like privileges were denied domestic debtors?  To that extent should there be inaugurated in the United States a dual monetary system, when the express purpose of the joint resolution was to have a single monetary system, where every dollar would be at parity in the payment of debts?

In considering more particularly the language of the joint resolution, we find the express wording sufficiently

broad to apply to the obligations herein of this defendant. The text of the joint resolution, including the preamble, is, in part, as follows:

" To assure uniform value to the coins and currencies of the United States.

" Whereas the holding of or dealing in gold affect the public interest, and are therefore subject to proper regulation and restriction; and

" Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it

" Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts." (48 U. S. Stat. 112.)

The above so clearly and unambiguously covers the bonds in suit as to leave no occasion for construction. Such language shows unmistakably that the Congress has

consciously drawn the joint resolution so as to apply to foreign debtors. If it be urged that the normal meaning of the terms employed does not cover the bonds in suit, then justification for such conclusion must be found in sources other than the language of the statute.

Furthermore, the intention of the Congress, as revealed by the preamble to the joint resolution quoted above, covers the obligations of foreign debtors. This preamble recites two facts as giving rise to the joint resolution, namely: " Provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money * * *." And secondly: " Are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar * * * in the markets and in the payment of debts." Whether the enforcement of these obligations lies at the hands of foreign or domestic debtors, the result is the same and this enforcement has been declared by the Congress to be destructive of the power and the policy of the Congress in its regulation of the money of the United States. The enforcement of gold clauses in foreign dollar bonds clearly would prevent the Congress from maintaining all forms of money of the United States at a parity of value. In other words, to enforce gold clauses in foreign dollar bonds and not in domestic bonds would, in effect, be the equivalent of maintaining, in some degree at least, a dual monetary system. Our history reveals in at least one instance a dual monetary system which was subsequently ended and thereafter Congress inaugurated a consistent legislative policy to prevent a recurrence of the evils of such a system.

In 1862, when the first Legal Tender acts were passed (12 U. S. Stat. 259 [1861], 338, 345, 370), the United States entered upon a dual monetary system which continued

for some years thereafter. Then " one dollar in coin was equivalent * * * to two dollars and a quarter in United States notes." (*Bronson* v. *Rodes*, 7 Wall. [U. S.] 229, 230.) This system ended when the country resumed specie payments in 1879. In 1893 Congress passed its first parity legislation, aimed at preventing the recurrence of the evils of the dual monetary system (Act dated Nov. 1, 1893; 28 U. S. Stat. 4). Thereafter the Parity Act of March 14, 1900, was enacted (U. S. C., title 31, § 314; 31 U. S. Stat. 45). Lastly, there is the Agricultural Act of May 12, 1933 (48 U. S. Stat. 31, 51–53). The joint resolution merely stated more specifically that which had already been enacted under the Agricultural Act (May, 1933).

The intention of the Congress to cover by the joint resolution both domestic and foreign debtors is revealed also by the following: In committee, Senator Carter Glass offered an amendment to the joint resolution, expressly exempting foreign obligations from the coverage of the joint resolution. This amendment was lost in committee. Senator Fletcher, the chairman of the Committee on Banking and Currency, which reported the joint resolution, clearly urged the necessity for putting all classes of dollar bonds on the same footing: " The situation cannot be met merely by enabling new obligations to be payable in legal tender without creating a difference in value between the old and the new obligations and impairing or destroying the market for new obligations. Investors would no doubt prefer private obligations with a gold clause to Government obligations payable in currency. In other words, we cannot make a distinction. The moment bonds or certificates or notes are offered to the public payable in legal tender, with outstanding obligations of the Government payable in gold, it will be seen that investors would rush to the gold obligations and call for that sort of security and would not take the new certificates or the new debentures or

the new bonds or the new obligations. It will interfere both with financing of the Government and financing of private enterprise. We would pass two different kinds of currency if we were to attempt that." (Vol. 77, Cong. Rec. pt. 5, p. 4890, June 3, 1933).

The following quotation from *Norman* v. *B. & O. R. R. Co.* (*supra*) not only sets forth the intention of the Congress, as expressed in the joint resolution, but also finally disposes of any contention that the application of the joint resolution violates the due process clause of the Constitution of the United States: "We are concerned with the constitutional power of the Congress over the monetary system of the country and its attempted frustration. Exercising that power, the Congress has undertaken to establish a uniform currency, and parity between kinds of currency, and to make that currency, dollar for dollar, legal tender for the payment of debts. In the light of abundant experience, the Congress was entitled to choose such a uniform monetary system, and to reject a dual system, with respect to all obligations within the range of the exercise of its constitutional authority. The contention that these gold clauses are valid contracts and cannot be struck down proceeds upon the assumption that private parties, and States and municipalities, may make and enforce contracts which may limit that authority. Dismissing that untenable assumption, the facts must be faced. We think that it is clearly shown that these clauses interfere with the exertion of the power granted to the Congress and certainly it is not established that the Congress arbitrarily or capriciously decided that such an interference existed " (p. 316).

The joint resolution has thus revealed clearly the intention of the Congress to regulate the kind and amount of the currency wherewith the obligation may be discharged, as a matter of public policy in this jurisdiction. The parties to a contract may not by their intention, however expressed, override the laws of the country in

which suit is brought when a matter of the public policy of that country is involved. Even comity with the laws of another jurisdiction never extends to the enforcement of a law of that jurisdiction which violates a positive law of the country wherein suit is brought and is contrary to its public policy. (American Law Institute, Restatement of the Law of Conflict of Laws, p. 440; *DeBeéche* v. *South American Chilean Stores, Ltd.,* [1935] A. C. 148.) Consequently, it becomes immaterial whether the obligations of these bonds would otherwise be governed by some foreign law. In view of this, does any question of lack of power remain? The answer must be in the negative because of the language of the Chief Justice in *Norman* v. *B. & O. R. R. Co. (supra)*: " The broad and comprehensive national authority over the subjects of revenue, finance and currency is derived from the aggregate of the powers granted to the Congress * * * " (p. 303).

Modern decisions in foreign jurisdictions have likewise affirmed the joint resolution as a defense in actions brought for relief identical with that in the case at bar. (*Amsterdam Stock Exchange Committee* v. *Bataafsche Petroleum Maatschappij,* Court of Appeal at The Hague, Jan. 15, 1935; *Amsterdam Stock Exchange Committee* v. *Royal Dutch Co.,* Court of Appeal at The Hague, Jan. 15, 1935; *International Federal Loan of Austria,* [1930 American Section] Bezirksgericht, Innere Stadt Wein, March 1, 1934, Die Rechtsprechung 83 [1934]; *Soderberg* v. *Telephone Co. of Copenhagen,* Superior Court for the Eastern District of Denmark, Feb. 3, 1934; *Vereinigte Stahlwerke,* German Appellate Court of Cologne; *Matter of International Trustee for Protection of Bondholders of Aktiengesellschaft,* High Court of Justice, Kings Bench Division, November, 1935.)

In *Amsterdam Stock Exchange Committee* v. *Bataafsche Petroleum Maatschappij (supra)* a stock exchange commission of Amsterdam which represented individual Dutch holders of bonds of the defendant, a Dutch cor-

poration, brought an action, as in the case at bar, to enforce dollar gold bonds issued and made payable in New York. The court held that the joint resolution was a defense to an attempt to collect in Holland the gold value of these bonds. So too in the other cases cited.

From the foregoing it is clear that the Congress, pursuant to its constitutional power over the currency, has prevented a recurrence in the history of the country of a dual monetary system made possible because of the reduction in the gold content of the dollar, by applying the joint resolution equally to foreign and domestic dollar bonds payable in the United States.

The judgment should be affirmed, with costs. (See 269 N. Y. 602.)

CRANE, Ch. J., O'BRIEN, HUBBS, CROUCH and LOUGHRAN, JJ., concur; LEHMAN, J., not sitting.

Judgment affirmed.