The FLEISCHMANN DISTILLING COR-
PORATION and *Julius Wile Sons &
Co., Inc.,* Plaintiffs,

v.

The DISTILLERS COMPANY LIMIT-
ED et al., Defendants.

No. 73 Civ. 5467.

United States District Court,
S. D. New York.

May 12, 1975.

Lord, Day & Lord, New York City, for plaintiffs.

Davis Polk & Wardwell, New York City, for defendants.

## OPINION

ROBERT L. CARTER, District Judge.

*The Nature of the Controversy*

This action was commenced in late 1973 pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1; Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22; Sections 73 and 77 of the Wilson Tariff Act, 15 U.S.C. §§ 8, 15; and Section 37 of the Lanham Act, 15 U.S.C. § 1119. Jurisdiction is asserted under 28 U.S.C. §§ 1332, 1337, 1338, 1391(d) and 2201.

Plaintiffs, Fleischmann Distilling Corporation ("Fleischmann") and Julius Wile Sons & Co., Inc. ("Wile"), are each a wholly-owned subsidiary of Standard Brands Incorporated ("SBI"). Plaintiffs rectify and bottle distilled spirits throughout the United States. The de-

fendants, The Distillers Company Limited ("DCL"), James Buchanan & Company Limited ("Buchanan"), and Peter Dawson Limited ("Dawson"), are all corporations organized and existing under the laws of the United Kingdom. Buchanan and Dawson are wholly-owned subsidiaries of DCL and manufacture and sell Scottish-Bottled Scotch whiskey under various trademarked brands.[1]

Defendants have moved for dismissal of the second, third, fourth, fifth and sixth claims of the complaint under Rule 12(b)(6) of the F.R.Civ.P. for failure to state a claim upon which relief may be granted, and for dismissal of the second, fourth and sixth claims under Rule 12(b)(1) for lack of subject matter jurisdiction. Alternatively, defendants move to treat their Rule 12(b)(6) motion as one for summary judgment, as provided in Rule 12(b).[2]

*Factual Background*

Buchanan and Dawson brands are sold f. o. b. United Kingdom ports to exclusive United States distributors which import and distribute the brands in the United States. Fleischmann and Wile operated under such distributorships with Buchanan and Dawson for 35 and 37 years respectively, until the termination of the Fleischmann-Buchanan relationship in 1973 and the Wile-Dawson relationship in 1972, according to the terms of the respective agreements. Affidavit of Cary Younghusband, Managing Director of Buchanan, ¶¶ 11, 22 (hereafter Younghusband affidavit); Affidavit of John McCormack, Director

---

1. Buchanan's brands include "Black and White" and "Buchanan's." Dawson's brands include "Peter Dawson" and "Peter Dawson Special."

2. Rule 12(b) provides in pertinent part:
"If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided

in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Rule 12(b), F.R.Civ.P.
Rule 56 states in pertinent part:
"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R. Civ.P.

of Dawson, ¶¶ 8, 19, 21–22 (hereafter McCormack affidavit).

### The Fleischmann-Buchanan Dispute

The Fleischmann-Buchanan relationship was inaugurated in 1939, when the parties entered into a ten-year exclusive distributorship agreement. Reliance on their long-term association allegedly spurred Fleischmann to invest heavily in the advertising and sales promotion of Black & White; the brand was the leading seller in the United States during this period. Affidavit of Walter Devlin, Executive Vice-President of Fleischmann, ¶ 6 (hereafter Devlin affidavit). In 1948, a further distributorship arrangement was entered into for a five-year term.

The third agreement, dated October 21, 1953, is the subject of this litigation. It was executed in London following negotiations initiated by Fleishmann in January of that year. It appointed Fleischmann sole distributor for Buchanan brands in the United States, stated that all sales were to be made f. o. b. United Kingdom ports with payment to be made by credit established at a London bank, and specifically provided that it was to be interpreted in accordance with the laws of England. Following an initial one-year term, the undertaking would continue contingent on termination by either party upon three months' written notice. Exhibit C to Younghusband affidavit.

The decline in Scotch whiskey production during World War II led to a general shortage of the product and resulted in almost every brand being put on allocation. Devlin affidavit, ¶ 8 and Exhibits D–G thereto. This state of affairs, coupled with the near-impossibility of acquiring any other Scotch whiskey distributorship from DCL, professedly resulted in such acute, unequal bargaining power that Fleischmann had no choice but to acquiesce in the one-year span of the 1953 agreement and its termination condition. Devlin affidavit, ¶¶ 8–10.

Until the early 1960's, sales of Buchanan brands in the United States rose continuously. Then sales began to decline. Between 1959 and 1972, shipments by Buchanan to Fleischmann fell by over 54%. Younghusband affidavit, ¶ 14 and Exhibit F thereto. During the same period total imports of Scotch whiskey into the United States expanded by over 185%. Id., ¶ 15 and Exhibit H thereto. The downturn in Black & White's fortunes became increasingly acute in 1971, and in 1972 there had been a 16% drop from shipments in the preceding year. Id., ¶ 16.

The concern by Buchanan of its loss of number one sales position in this country and the sharp declivity in imports was brought to Fleischmann's attention on several occasions prior to termination. Younghusband affidavit, ¶¶ 14–20 and Exhibits K–O thereto. Despite advertising campaigns initiated in 1971–1972, Devlin affidavit, ¶¶ 17–20, sales continued to drop in 1973, and by letter dated August 23,[3] Buchanan notified Fleischmann that the agreement was being terminated in accordance with the contract provision. Termination was effective on December 31, 1973, officially giving Fleischmann four months' notice. Younghusband affidavit, ¶ 22 and Exhibit L thereto.

### The Wile-Dawson Dispute

Wile's business connection with Dawson had its inception in 1935 when Wile was first appointed exclusive United States distributor for the Dawson brands. Until 1954 Wile and Dawson had no written contract, the former being of

3. By separate letter on the same date, Younghusband wrote to Fleischmann:

"As you know, for a considerable time past we have been seriously concerned by the progressive deterioration in the performance of BLACK & WHITE in the United States. Unfortunately, the change which we wished to see has not materialized and finally, after the most careful consideration, we have reached the conclusion that no alternative is left but to make a change in our distribution arrangements." Exhibit K to Younghusband affidavit.

the opinion that no written contract was preferable to the short-term commitments then being offered. Affidavit of Richard Blum, President of Wile, ¶ 9 (hereafter Blum affidavit). In 1954 and 1955 written contracts were executed, providing for one-year terms to be automatically renewable subject to three months' notice. Following a proposal by Dawson for a duration of one year, and a counter-proposal by Wile for a five-year term, a new agreement was executed in 1964 for a two-year term, but without any condition for automatic renewal. At the conclusion of the first year and upon satisfactory performance, Wile could request and receive a new two-year contract upon similar terms. Each year from 1965 through 1971, Wile and Dawson entered into new two-year obligations. Blum affidavit, ¶¶ 11–13; McCormack affidavit, ¶¶ 9–12.

The 1968 agreement contained a "termination upon a change of control of Wile" clause. Sixty days' notice of termination was to be given within thirty days after Dawson received notice that there had been a change in working control of Wile. McCormack affidavit, ¶ 13 and Exhibit C, ¶ 15(d) thereto. Informed by DCL that these provisos were being uniformly inserted into all contracts between DCL subsidiaries and their distributors, Wile acquiesced in the clause's inclusion because the possibility of actual change in control seemed remote and "because in light of previous dealings with [DCL it was] felt that a protest would be fruitless." Blum affidavit, ¶ 14. Dawson affirms that the clause in fact was discussed and then accepted by Blum without objection, the latter apparently observing that such

provisions were already included in other distributorship agreements which Wile had with other suppliers. Affidavit of John Gilderdale, counsel to DCL, ¶¶ 4, 5.[4]

The last contract executed between Wile and Dawson, dated April 30, 1971, included both the change of control provision and the two-year term. In all other respects, it was similar to the Fleischmann-Buchanan agreement, including the clause that its interpretation be governed in accordance with the law of England. Exhibit C to McCormack affidavit.

On March 2, 1972, Henry Weigl, the President of SBI, informed Sir Alex McDonald, Chairman of DCL, that SBI had signed a letter of intent to acquire Wile. On March 9, 1972, Blum came to London and discussed the proposed acquisition with DCL seeking relinquishment by Dawson of the right to terminate upon change of control. Wile was unsuccessful in obtaining the waiver; instead the import of the discussion was that the Wile-Dawson association would be jeopardized by the acquisition. Blum affidavit, ¶ 27; McCormack affidavit, ¶ 15.[5]

Dawson's view that the agreement would end when SBI obtained control of Wile was communicated to the latter by McDonald on March 20, 1972. Exhibit D to McCormack affidavit; Blum affidavit, ¶ 28. On March 30, 1972, Dawson gave Wile formal notice of termination based on the erroneous belief that SBI had already assumed working control of Wile. Blum affidavit, ¶ 29 and Exhibit I thereto. Wile responded on April 3, 1972, that working control had not yet passed to SBI and that no binding agree-

---

4. Wile states that the change of control clauses found in Wile's contracts with other suppliers were only included in conjunction with and as a *quid pro quo* for a five-year "rolling" automatically renewable term. Blum affidavit, ¶ 16 and Exhibit C thereto.

5. Regarding the proposed acquisition, Dawson states:
   "In the case of Wile the change of control would have resulted in the distribution of the

Dawson brands coming under the control of SBI whose subsidiary company Fleischmann was well known by Dawson to be the unsuccessful distributor of the Buchanan brands. Dawson viewed the proposed acquisition of Wile by SBI with apprehension and therefore decided that if the acquisition took place it would exercise its right to terminate . . . ." McCormack affidavit, ¶ 16.

ment had been executed. McCormack affidavit, ¶ 18 and Exhibit F thereto. Accordingly, Dawson rescinded the notice on April 11, 1972. *Ibid.* and Exhibit G. Wile avows that it could not ascertain whether Dawson would terminate if control passed. Blum affidavit, ¶ 32.

On July 10, 1972, Wile apprised Dawson that an agreement had been reached with SBI, and that control would transfer on or about August 31, 1972. Wile's letter acknowledged that "paragraph 15 (c) of our contract with you provides that you have the right to cancel this agreement within thirty days of receipt of notice from us of the 'passing of control' from the present stockholders to other stockholders." Exhibit H to McCormack affidavit. Wile gave formal notice of the change in working control on October 11, but urged that the agreement not be concluded. Blum affidavit, ¶ 33. Dawson gave formal notice of termination on October 23, 1972, with the effective date of termination extended to December 31, 1972. McCormack affidavit, ¶ 22 and Exhibit L thereto.

*The Antitrust Claims*

*Subject Matter Jurisdiction*

■ Defendants move to dismiss the second, fourth and sixth claims of the complaint for lack of subject matter jurisdiction.[6] The second claim alleges that DCL conspired with its subsidiaries Buchanan and Dawson to impose unreasonably short terms and short notice of termination provisions and that pursuant to the alleged conspiracy the distributorships were terminated, all in violation of Section 1 of the Sherman Antitrust Act[7] and Section 73 of the Wilson Tariff Act.[8] The fourth and sixth claims are also based on purported violations of the antitrust laws, and allege that the notice of termination provisions were so unreasonable as to constitute restraints of trade. The thrust of the motion to dismiss for lack of subject matter jurisdiction is that plaintiffs have failed to allege that the asserted antitrust violations were intended to restrain and had a direct and material adverse effect on interstate or foreign commerce. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 704–705, 82 S.Ct. 1404, 8 L.Ed. 2d 777 (1962); United States v. Aluminum Co. of America, 148 F.2d 416, 443–44 (2d Cir. 1945); United States v. Watchmakers of Switzerland Information Center, Inc., 1963 Trade Cas. ¶ 70,-000, at 77,457 (S.D.N.Y.1962); United States v. General Electric Co., 82 F. Supp. 753, 890 (D.N.J.1949); Fugate,

---

6. Defendants have also moved to dismiss the three claims for failure to state a claim upon which relief may be granted. Rule 12(b)(6) of the F.R.Civ.P. Since the other motion need not be reached if subject matter jurisdiction is lacking, that motion will be considered first. *See* Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); John Birch Society v. National Broadcasting Co., 377 F.2d 194, 197 n. 3 (2d Cir. 1967); Wright & Miller, Federal Practice and Procedure: Civil § 1350 at 548 (1969).

7. Section 1 of the Sherman Act provides in part:
"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." 15 U.S.C. § 1.

8. Section 73 of the Wilson Act provides in part:
"Every combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal, and void when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into which such imported article enters or is intended to enter. Every person who shall be engaged in the importation of goods or any commodity from any foreign country in violation of this section, or who shall combine or conspire with another to violate the same, is guilty of a misdemeanor . . . ." 15 U.S.C. § 8.

Foreign Commerce and the Antitrust Laws 44–51 (Rev. ed. 1973).

The complaint, read in the light most favorable to plaintiffs, is sufficient to withstand the motion to dismiss. Though defendants are United Kingdom corporations whose products are sold f. o. b. United Kingdom ports, the complaint alleges that the contracts and acts in question concern distribution of whiskey into the United States. Paragraph 10 of the complaint avers that DCL's subsidiaries distribute brands of Scotch whiskey in the United States through exclusive distributorships, and paragraph 11 avers that the production and distribution of Scotch whiskey embody a "continuous stream of commerce among the States and with foreign nations" and that the "acts, practices, contracts, combinations, and conspiracies herein alleged occurred in or directly affect commerce among the States and with foreign nations." The intent requirement, *see Aluminum Co. of America* and *General Electric Co., supra,* is a general intent to affect commerce, "and may be satisfied by the rule that a person is presumed to intend the natural consequences of his actions." *Fugate, supra,* at 48. Defendants' intent to affect United States commerce is inferrable from the assignment of exclusive distributorship rights in the United States. *Cf.* Erving v. Virginia Squires Basketball Club, 349 F.Supp. 709, 711 (E.D.N.Y.1972); Gordon v. National Broadcasting Co., 287 F.Supp. 452, 454 (S.D.N.Y.1968). In addition, paragraph 16, which is real-

leged in the three challenged claims, states that DCL has engaged in contracts in restraint of, conspired in restraint of, and has attempted to monopolize the trade and commerce in Scotch whiskey among the several states. The termination provisions in issue are professed to be part of this conspiracy. Paragraphs 26–28, 42, and 53.

*Failure to State a Proper Antitrust Claim*

Defendants also move to dismiss the second, fourth and sixth claims for failure to state a cause of action, or alternatively for the entry of summary judgment.[9] The thrust of this motion is that the antitrust claims are legally insufficient due to failure to allege that the asserted violations injure competition in any relevant market, i. e., failure to allege public injury through any reduction in competition in the sale of Scotch whiskey in the United States.

Section 1 of the Sherman Act makes illegal only those contracts or combinations which constitute unreasonable or undue restraints of trade. Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L. Ed. 619 (1911).[10] There is no allegation that the terminations, which were followed by the appointment of other exclusive distributors, restricted or restrained competition in the sale of Scotch whiskey in the United States[11],

9. See text accompanying note 2, *supra.*

10. Section 73 of the Wilson Tariff Act, see note 8, *supra,* has generally been viewed as "reinforcing" the Sherman Act, making illegal those combinations, conspiracies, trusts, and contracts between two or more persons or corporations either of whom is engaged in importing articles into the United States when intended to operate in restraint of trade. Section 73 "is not more comprehensive in its scope than the Sherman Act . . . serv[ing] only to make the law more specific in its application, as it relates to foreign commerce." Fosburgh v. California & Hawaiian Sugar Refining Co., 291 F. 29, 32 (9th Cir.

1923). *See* Reliable Volkswagen S.&S. Co. v. World-Wide Auto. Corp., 182 F.Supp. 412, 428 (D.N.J.1968); United States v. General Dyestuff Corp., 57 F.Supp. 642, 648 (S.D.N.Y.1944); Fugate, Foreign Commerce and the Antitrust Laws 395–96 (Rev.ed.1973).

Therefore, for purposes of this motion, the court need only consider the Sherman Act claim.

11. Nor could such allegations easily be raised. It is clear that the substitution of one distributor for another does not eliminate or reduce competition and, by itself, raises no Sherman Act claim, *see, e. g.,* Bay City-Abrahams Brothers, Inc. v. Estee-Lauder, Inc.,

and defendants argue that absent such allegations of public injury or anti-competitive effect, as opposed to injury to plaintiffs alone, the claims must be dismissed. *See, e. g.,* Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); Epstein v. Dennison Manufacturing Co., 1966 Trade Cas. ¶ 71,852, at 82,958 (S.D.N.Y.1966).

■ Several reasons mandate denial of this motion. The replacement of one distributor for another may be unlawful if the change is in furtherance of a horizontal conspiracy to boycott, or a price-fixing conspiracy, or a conspiracy to establish market dominance or monopoly. *See, e. g., Ace Beer Distributors, supra,* 318 F.2d at 287; Potter's Photographic Applications Co. v. Ealing Corp., 292 F.Supp. 92, 104–105 (E.D.N.Y. 1968).[12] These latter practices, being illegal *per se,*[13] are presumed to involve public injury eliminating the necessity for explicit allegations to that effect.

■■ Plaintiffs have, explicitly and implicitly, alleged that the inclusion and utilization of the termination provisions were components of a larger scheme in restraint of trade. Paragraphs 16 through 20 of the complaint, incorporated in the second, fourth and sixth claims, allege a conspiracy by DCL to monopolize the market in Scotch whiskey in the United States. The complaint can also be read as alleging that the termination provisions were included as an aspect of the alleged price-fixing conspiracy. Paragraphs 21 through 24 aver

that DCL has combined and conspired with its subsidiaries to fix and control the prices charged for Scotch whiskey sold for importation to the United States. While these paragraphs are not expressly incorporated in the three claims, prior allegations even in the absence of express incorporation should be considered in determining whether a good claim for relief is stated. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); David v. Sinclair Refining Co., 25 F.R.D. 190, 192 (S.D.N.Y.1960); Wright & Miller, Federal Practice and Procedure: Civil § 1326, at 487 (1969); *contra,* Reliable Volkswagen S.&S. Co. v. World-Wide Automobile Corp., 182 F.Supp. 412, 425 (D.N.J.1968).

■ Furthermore, it is not at all certain that allegations of public injury are even required in non-*per se* cases. *See, e. g.,* Switzer Brothers, Inc. v. Locklin, 297 F.2d 39, 47 (7th Cir. 1961), cert. denied, 369 U.S. 851, 82 S.Ct. 934, 8 L.Ed.2d 9 (1962); Allied Electric Supply Co. v. Motorola, Inc., 369 F.Supp. 133, 138 (W.D.Pa.1973). Cases in this circuit have held that an allegation of public injury is not essential in any claim for relief under Section 1 of the Sherman Act. *See* Syracuse Broadcasting Corp. v. Newhouse, 295 F.2d 269, 277 (2d Cir. 1961); K. S. Corp. v. Chemstrand Corp., 198 F.Supp. 310, 314 (S.D.N.Y.1961); Cowen v. New York Stock Exchange, 256 F.Supp. 462, 467 (N.D.N.Y.1966), aff'd, 371 F.2d 661 (2d Cir. 1967). Accordingly, the motion to dismiss will be denied.

---

375 F.Supp. 1206, 1214–17 (S.D.N.Y.1974) and cases cited therein, for a supplier "has the right to deal with whom he pleases and to select his customers at will" so long as no antitrust violations ensue. *Id.* at 1214.

12. The invocation of termination provisions, when in furtherance of such a scheme, may itself "run afoul of the Sherman Law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 468–69, 82 S.Ct. 486, 489, 7 L.Ed.2d 458 (1962); *see also* Englander Motors, Inc. v. Ford Motor Co., 267 F.2d

11, 15 (6th Cir. 1959); Lessig v. Tidewater Oil Co., 327 F.2d 459, 464 (9th Cir. 1964); Alles Corp. v. Senco Products, Inc., 329 F.2d 567, 570–71 (6th Cir. 1964).

13. There are a category of practices so inimical to the competitive system that the need to determine the reasonableness of the activity is obviated, these practices being considered illegal *per se.* Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 211, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

*Summary Judgment*

Defendants have also requested this court to treat their motion as one for summary judgment. As all parties have submitted affidavits, exhibits and 9g statements required by local rule, the motion may be so treated pursuant to Rule 56 of the F.R.Civ.P.

A motion for summary judgment can succeed only when there is no genuine issue of material fact. The court cannot try issues of fact but can only determine whether there are such issues to be tried. Empire Electronics Co. v. United States, 311 F.2d 175, 179 (2d Cir. 1962); see Wright & Miller, *supra,* § 2712, at 379. A juxtaposition of the 9g statements reveals sharp disputes regarding several facts material to the resolution of this case. Among the issues that require clarification through discovery and trial are whether the three months' notice of termination provision in the Fleischmann-Buchanan agreement was inserted as part of an alleged conspiracy by defendants to restrain trade in the United States whiskey market; whether the change in control provision in the Wile-Dawson contract which provided for termination at Dawson's option, upon sixty days' notice, and the two-year term of the agreement, were elements of this same alleged conspiracy; and whether the alleged conspiracy consisted of acts occurring in or affecting interstate or foreign commerce. As defendants have not satisfied their burden of showing the absence of any genuine issue as to all the material facts, summary judgment must be denied. 6 Moore's *Federal Practice,* ¶ 56.15[3], at 2335 (2d ed. 1972).

*Unconscionability and Choice of Law*

Plaintiffs' third and fifth claims allege that the notice periods for termination of the Fleischmann and Wile agreements were unreasonably short and unconscionable. Defendants, pursuant to Rule 12(b)(6), move to dismiss the two claims as legally inadequate under English law, which assertedly governs the agreements and which does not recognize the doctrine of unconscionability in a case like this.

The canon in New York, which controls the disposition of this issue, Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), is that the intent of the parties shall govern as to the choice of law regarding their contract, provided that intent can be discovered and that the state chosen bears a reasonable relationship to the agreement. A. S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957); Compania De Inversiones Internacionales v. Industrial Mortgage Bank, 269 N.Y. 22, 198 N.E. 617 (1935), cert. denied, 297 U.S. 705, 56 S.Ct. 443, 80 L.Ed. 993 (1936); Westchester Mortgage Co. v. Grand Rapids & I.R.R. Co., 246 N.Y. 194, 158 N.E. 70 (1927). *See also* Restatement (Second) of Conflict of Laws 2d § 187(2) (1971); Uniform Commercial Code (U.C.C.) § 1–105(1).

Both the Fleischmann and Wile agreements expressly provide that they are to be governed by the law of England, and the reasonable relation condition is met for the contracts were executed in the United Kingdom, Buchanan and Dawson were incorporated in the United Kingdom, performance by Buchanan and Dawson occurred in the United Kingdom, and payment was made and title to the goods passed in the United Kingdom. County Asphalt, Inc. v. Lewis Welding & Engineering Corp., 323 F.Supp. 1300, 1303 (S.D.N.Y.1970), aff'd, 444 F.2d 372 (2d Cir.), cert. denied, 404 U.S. 939, 92 S.Ct. 272, 30 L. Ed.2d 252 (1971); El Hoss Engineering & Transport Co. v. American Independent Oil Co., 183 F.Supp. 394 (S.D.N.Y. 1960), rev'd on other grounds, 289 F.2d 346 (2d Cir.), cert. denied, 368 U.S. 837, 82 S.Ct. 51, 7 L.Ed.2d 38 (1961); B. M. Heede, Inc. v. West India Machinery and Supply Co., 272 F.Supp. 236 (S.D.N.Y.1967); Reines Distributors, Inc. v. Admiral Corp., 256 F.Supp. 581 (S.D.N.Y.1966).

**230**

■ Plaintiffs seek to blunt the *prima facie* demonstration that English law controls by countering with the proposition that the choice of law provisions were imposed upon them, and hence do not reflect the intent of the parties. Since the application of New York law would be harmonious with the result reached under English law, no detailed analysis is required of the contentions that the choice of law provisions are unconscionable and are an attempt to circumvent fundamental public policy embodied in N.Y.U.C.C. § 2–302 (McKinney's 1964).[14]

*English Law*

■ The parties, reaching rare unanimity, agree that the crucial question is whether English courts would give relief to plaintiffs if the complaint's allegations are true. As no special statute exists governing distributorship agreements or their termination, such contracts are subject to the general rule of English law of contract. Plaintiffs concede that no precedent exists under English law for the unconscionability claims, and that "the avoidance of a particular term in a contract . . . has so far been confined by the English courts to penalties and to certain terms which are void as contrary to public policy." Affidavit of John Hull, Barrister of Law, ¶ 13 (hereafter Hull affidavit). *See* Maxim Nordenfelt Guns & Ammunition Co. v. Nordenfelt, [1893] 1 Ch. 630; Nagle v. Feilden, [1966] 2

Q.B. 633; *see generally* 8 Halsbury, The Laws of England 130–36 (3d ed. 1954).

England has no specific doctrine of avoidance of contracts or contract terms based on inequality of bargaining power, Hull affidavit, ¶ 6; Affidavit of David Sullivan, Barrister of Law, ¶ 13 (hereafter Sullivan affidavit); Cheshire & Fifoot, Law of Contract 282 (8th ed. 1972); *but cf.* Lloyds Bank Ltd. v. Bundy, [1974] 3 W.L.R. 501, 508–509 (C.A.) (Lord Denning), and even the emergence of standard form contracts has failed to provoke English courts to set aside terms which might be deemed "unreasonable." Anson, Principles of the English Law of Contract 168, 169 (22d ed. 1964) ("But, in England, there is still a reluctance to walk upon the shifting sands of public policy and to absolve the parties from an agreement into which they have formally entered on the grounds merely that it is unreasonable. It may be that the law will expand to meet changing economic conditions, but it cannot yet be said with certainty that this power exists.")

Courts in England have avoided contract terms which are the result of duress or undue influence; however, neither doctrine is available to plaintiffs. At both common law and equity the doctrine of duress allows a court to avoid a contract which has been obtained under pressure or by intimidation. Duress is shown at common law by actual or threatened violence or imprisonment by one contracting party to

14. I might say, however, that plaintiffs have not made a persuasive case for unconscionability. To prevail, they must show that they were unable to exercise any "meaningful choice" and that the choice of law provisions were "so extreme as to appear unconscionable." William v. Walker-Thomas Furniture Co., 121 U.S.App.D.C. 315, 350 F.2d 445, 450 (1965). Regarding choice, the complaint and supporting affidavits at best only suggest that it was defendants' bargaining power, as opposed to any oppressive actions, which led plaintiffs to accept the choice of law provisions. No unlawful coercion has been demonstrated. American Mfrs. Mut. Ins. Co. v. American Broadcasting-Parmount The-

atres, Inc., 446 F.2d 1131, 1137 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972); Weiner v. Tele King Corp., 123 N.Y.S.2d 101 (Sup.Ct.1953); Criterion Holding Co. v. Cerussi, 140 Misc. 855, 856, 250 N.Y.S. 735, 737 (Sup.Ct.1931). Plaintiffs' own affidavits reveal that in several instances each successfully protested contractual terms offered by defendants. Blum affidavit, ¶¶ 11, 12, 15, 24(10); Devlin affidavit, ¶ 26. It also seems disingenuous to suggest that major corporations are akin to the usual victims of adhesion contracts.

The provisions themselves are not substantively unconscionable since England bears a reasonable relation to the transaction.

the other, his wife, parent, child or other close relative. The duress must be personal, and not directed to a man's goods, and is not normally generated by the threat of doing a lawful act. *See* Cheshire & Fifoot, *supra*, at 281. In equity, a contract obtained by the threat of one party to prosecute the other party for a criminal offense could be voidable under the doctrines of duress or undue influence. Williams v. Bayley (1866), L.R. 1 H.L. 200; Mutual Finance, Ltd. v. John Wetton & Sons, Ltd., [1937] 2 K.B. 389; *see Anson, supra*, at 243–45.

The equitable doctrine of undue influence arises "where the parties stand to one another in a relation of confidence which puts one of them in a position to exercise over the other an influence which may be perfectly natural and proper in itself, but is capable of being unfairly used." *Anson, supra*, at 246. In only two circumstances can undue influence be found. The first is where one party has exercised undue influence in the sense of domination over the other; the one has to exercise such control over the mind and will of the other that the latter's will is overborne and he is incapable of making an independent decision. *See, e. g.*, Nottidge v. Prince (1860), 2 Giff. 246 (person of weak mind coerced by person claiming to have supernatural powers); Lyon v. Home (1868), L.R. 6 Eq. 655 (person was convinced of the truth of messages from the dead via a medium); Hodgson v. Marks, [1971] 1 Ch. 892; Cheshire & Fifoot, *supra*, at 283–84. The second situation involves a "special relationship" between the parties which leads to an abuse of the duties of that confidence. Tate v. Williamson (1866), 2 Ch.App. 55, 61; *Anson, supra*, at 247–50; Cheshire & Fifoot, *supra*, at 284–87. The "special relations" have included parent-child, Bainbrigge v. Browne (1881), 18 Ch.D. 188; Lancashire Loans, Ltd. v. Black, [1934] 1 K.B. 380;

lawyer-client, Wright v. Carter, [1903] 1 Ch. 27; doctor-patient, Mitchell v. Homfray (1881), 8 Q.B.D. 587; Re C. M. G., [1970] 1 Ch. 574; trustee-beneficiary, Beningfield v. Baxter (1886), 12 App.Cas. 167; spiritual adviser-advisee, Allcard v. Skinner (1887), 36 Ch.D. 145; secretary-companion, Re Craig, [1971] 1 Ch. 95; bank-customer, *Lloyds Bank, supra*.

Courts have also avoided contracts with "expectant heirs" or with "uneducated ignorant persons", O'Rorke v. Bolingbroke (1887), 2 App.Cas. 814, 823; Fry v. Lane (1888), 40 Ch.D. 312; *see also Lloyds Bank, supra; contra*, Cheshire & Fifoot, *supra*, at 282 (doubting whether an English court would set aside a contract merely because one party was poor or ignorant), and though this doctrine of avoidance is sometimes labeled "unconscionable bargains", that doctrine is as inapposite here as are the doctrines of duress and undue influence because it's only been applied to the situation where advantage was taken of a private individual. *Cf.* Undue Influence and Inequality of Bargaining Power, 34 Cambridge L.J. 21, 24 (1975).

Given the inapplicability of these doctrines, this court is hard-pressed to go beyond plaintiffs' express concession that, barring undue influence on an individual, "there is no case in which an oppressive or unconscionable bargain has been avoided between corporations." Hull affidavit, ¶ 13. No case has been found in which a court has denied a party the right to terminate a contract in accordance with a contract provision, *see Halsbury, supra*, at 159; *but c. f.* Chapman v. Honig, [1963] 2 Q.B. 502 (dissenting opinion). This review and my understanding that plaintiffs' claims are not cognizable under the law of England requires dismissal of the third and fifth claims with prejudice for failure to state a claim upon which relief may be granted.[15]

15. Since the determination of foreign law is a question of law, Rule 44.1, F.R.Civ.P., such dismissal or even a grant of summary judgment is appropriate. Instituto Per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Products, Inc., 323 F.Supp. 630,

**232**

*New York Law*

No different action would be rendered if New York Law, as embodied in Article 2 of the N.Y.U.C.C. (sales), were controlling. N.Y.U.C.C. § 2–302 [16] mandates a finding of unconscionability only where there is an absence of meaningful choice for one party plus contract terms which unreasonably favor the other party. See note 14, *supra*.

▇▇▇ The absence of "meaningful choice," or procedural unconscionability, turns on the contract formation process, e. g., whether the important terms of a contract were understood, whether high-pressure or deceptive sales practices were utilized, whether terms were hidden in fine print, and whether there was gross inequality of bargaining power. *See, e. g.*, Nu Dimensions Figure Salons v. Becerra, 73 Misc.2d 140, 340 N.Y.S.2d 268 (Sup.Ct.1973).

▇▇▇ Plaintiffs' argument that the termination provisions were imposed by virtue of "oppressive tactics" resulting from inequality of bargaining power finds no support in either the complaint nor the submitted affidavits; at best plaintiffs show that defendants enjoyed superior bargaining power [17], which by itself raises no claims of unlawful coercion or duress. See Note 14, *supra*. And the mere exercise of superior bargaining power does not indicate unconscionability. Official Comment 1 to § 2–302 (McKinney's 1964).

▇▇▇ Moreover, the record before me does not buttress the claim that any inequality of bargaining power resulted in plaintiffs being *compelled* to accept the provisions. The three months' notice of termination was the topic of negotiation between the parties, Younghusband affidavit, ¶¶ 10–11, was certainly under-

---

635 (S.D.N.Y.1971); Burnett v. Trans World Airlines, Inc., 368 F.Supp. 1152, 1156 (D.N.M.1973); First National Bank v. British Petroleum Co., 324 F.Supp. 1348, 1354–55 (S.D.N.Y.1971); Bassis v. Universal Line, S.A., 436 F.2d 64, 68 (2d Cir. 1970), aff'g 322 F.Supp. 449 (E.D.N.Y.).

16. U.C.C. § 2–302, as adopted in New York, is entitled Unconscionable Contract or Clause and provides as follows:
"(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." New York Uniform Commercial Code, § 2–302 (McKinney's 1964).

17. This is assumed *arguendo*. Fleischmann has been a wholly-owned subsidiary of SBI since its first agreement with Buchanan in 1939. SBI was ranked 124th on *Fortune's* 1974 list of the 500 largest industrial corporations in the United States. A comparison of the sales assets and net income of SBI and DCL at about the time the Fleischmann-Buchanan agreement was executed, and also for 1973, reveals the following:

| | Sales | Assets | Net Income |
|---|---|---|---|
| | | 1954 | |
| DCL | – | $296,039,000 | $ 20,491,000 |
| SBI | $407,675,000 | $160,865,000 | $ 10,019,000 |
| | | 1973 | |
| DCL | $1,115,184,000 | $1,238,175,000 | $110,303,000 |
| SBI | $1,469,540,000 | $ 802,222,000 | $ 48,807,000 |

Defendants' Memorandum at 27 and Affidavit of William Elgood, Secretary and Director of DCL, ¶5.

stood by Fleischmann, Exhibit B to Younghusband affidavit, and the acceptance of that provision can only be characterized as a product of meaningful choice.

Wile's acceptance of the termination upon change of control provision, and its notice period, must also be ascribed to meaningful choice. Affidavits from both sides indicate that substantial negotiations often accompanied the succession of agreements between 1935 and 1972, McCormack affidavit, ¶¶ 8–12 and Exhibit B thereto; Blum affidavit ¶¶ 11, 13, 14, and on at least one occasion Wile specifically had the proposed contract reviewed by counsel. Exhibit A to McCormack affidavit. The change of control provision was first proposed to Wile in 1968, and Wile's president said he had no objection to its inclusion. McCormack affidavit, ¶ 14. In 1974, Wile expressly recognized Dawson's right to terminate within sixty days, McCormack affidavit ¶¶ 19, 21; Blum affidavit, ¶ 33, so it cannot be maintained that Wile neither understood the provision nor exercised meaningful choice in accepting it. Moreover, it is difficult to credit the contention of "dictated" clauses when the affidavits of Fleischmann and Wile show successful protest and negotiation regarding other contract terms, Devlin affidavit, ¶ 26; Blum affidavit, ¶¶ 10, 11, 12, 15, 24(10).

■ Though a commercial setting does not necessarily bar a claim of procedural unconscionability, "it is the exceptional commercial setting where a claim of unconscionability will be allowed," *County Asphalt, supra,* 323 F.Supp. at 1308, particularly where the cries of unconscionability are made by large corporations, Royal Indemnity Co. v. West-

inghouse Electric Corp., 385 F.Supp. 520, 524–525 (S.D.N.Y.1974); Boone Valley Cooperative Processing Association v. French Oil Mill Machinery Co., 383 F.Supp. 606, 612 (N.D.Iowa 1974). The "exceptional" case, whatever it might be, is certainly not the one before me. Plaintiffs have not presented a case for the absence of meaningful choice.

Plaintiffs have also foundered in their attempt to show that the termination provisions and their notice periods are substantively unconscionable under New York law. The rule in New York is that termination clauses will be enforced as written, and provisions allowing termination "at any time," A. S. Rampell v. Hyster, *supra,* upon thirty days' notice, Cycleway, Inc. v. Kawasaki Motors Corp., 77 Misc.2d 829, 354 N.Y.S.2d 812 (Sup. Ct.1974); Noah v. L. Daitch & Co., 22 Misc.2d 649, 192 N.Y.S.2d 380 (Sup.Ct. 1959), upon ten days' notice, Sinkoff Beverage Co v. Joseph Schlitz Brewing Co., 51 Misc.2d 446, 273 N.Y.S.2d 364 (Sup.Ct.1966), and without cause, Division of Triple T Service, Inc. v. Mobil Oil Corp., 60 Misc.2d 720, 304 N.Y.S.2d 191 (Sup.Ct.1969), aff'd, 34 A.D.2d 618, 311 N.Y.S.2d 961 (2d Dep't 1970); Mobil Oil Corp. v. Lione, 66 Misc.2d 599, 322 N.Y.S.2d 82 (D.Ct. Suffolk Co. 1971), have all been upheld against charges of unconscionability.

■ Plaintiffs can cite no New York case to sustain their propositions that the termination provisions were unconscionable because the notice periods were unreasonably short, provided no recoupment, or were unnecessarily broad. The provisions were neither procedurally nor substantively unconscionable. New York law would also require the dismissal of the third and fifth claims.[18]

---

18. The determination of unconscionability is a question of law properly before the court on a motion to dismiss or on a motion for summary judgment. *See, e. g.,* Wilson Trading Corp. v. David Ferguson Ltd., 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968). A factual hearing on unconscionability, N.Y.U.C.C. § 2–302(2), is only mandatory once the court accepts the *possibility* of unconscionability. Finding no basis for

such a possibility here, no hearing is required. Architectural Aluminum Corp. v. Macarr, Inc., 70 Misc.2d 495, 333 N.Y.S.2d 818 (Sup.Ct.1972); Sinkoff Beverage Co. v. Joseph Schlitz Brewing Co., 51 Misc.2d 446, 273 N.Y.S.2d 364 (Sup.Ct.1966); Division of Triple T Service, Inc. v. Mobil Oil Corp., 60 Misc.2d 720, 304 N.Y.S.2d 191 (Sup.Ct. 1969), aff'd, 34 A.D.2d 618, 311 N.Y.S.2d 961 (2d Dep't 1970).

234

The motions to dismiss the second, fourth and sixth claims for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted are denied. The motion for summary judgment as to the second, fourth and sixth claims is also denied. The motion to dismiss with prejudice the third and fifth claims for failure to state a claim upon which relief can be granted is granted.

So ordered.