L. ORLIK LTD., Plaintiff,

v.

HELME PRODUCTS INC. and Whitehall Products, Inc., Defendants.

No. 75 Civ. 3435 (CHT).

United States District Court,
S. D. New York.

Feb. 22, 1977.

Weiss, Rosenthal, Heller & Schwartzman, New York City, for plaintiff; Richard F. Horowitz, Eli Feit, New York City, of counsel.

Mudge, Rose, Guthrie & Alexander, New York City, for defendants; Milton Black, Harold G. Levinson, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

Plaintiff L. Orlik Ltd. ("Orlik"), an English corporation engaged in the manufacture of briar pipes and tobacco accessories, brought this diversity action against defendants Helme Products, Inc. ("Helme") and Whitehall Products, Inc. ("Whitehall"), New York and New Jersey corporations respectively.[1] Orlik alleges that the defendants breached a contract under which the defendants had an obligation to purchase a minimum amount of briar pipes every year during the life of the contract, and moves for summary judgment. For the reasons stated below, the plaintiff's motion is granted insofar as the defendants'

1. Subsequent to the commencement of this action, Helme ceased to have separate corporate existence by reason of its merger into General Cigar Co., Inc. Defendants' Memorandum of Law at 1 n. **.

liability is concerned. With respect to damages, however, genuine issues of material fact exist, precluding an award of summary judgment. The case is referred to United States Magistrate Nina Gershon for an inquest on damages pursuant to the Court's findings on the applicable law, as stated below.

At issue in this case is a contract for the sale and distribution of the plaintiff's briar pipes in the United States. The contract was first entered into by the plaintiff and Mastercraft Briars, Inc. ("Mastercraft") and is memorialized in a letter signed by both parties and dated October 29, 1970 ("1970 Agreement"). Although the 1970 Agreement contained a number of terms, its essence is found in these two clauses:

"4. You [Mastercraft] shall be the sole and exclusive distributor for the United States of America of briar pipes manufactured by us [Orlik]. We shall not knowingly sell so as to affect, directly or indirectly, distribution in such purchases through any person other than you.

"5. So long as this agreement is in force you agree to purchase not less than £ 40,000 per annum of our briar pipes from us (except for the first year 1971 when the minimum purchases shall be not less than £ 12,000), the assortment of which should correspond to the various qualities available from best quality briar root." [2]

Soon after the execution of this agreement, the plaintiff learned that Mastercraft was going out of business. In January of 1971, Mr. Harry J. Feaser, a Vice President of Whitehall, and Mr. G. Jackson Ratcliffe, a Vice President of Helme, went to England to negotiate with Orlik concerning an assignment of the agreement between Orlik and Mastercraft. This assignment was accomplished and memorialized in a letter from Orlik dated January 27, 1971 ("1971 Agreement"), which adopted all the terms of the earlier agreement and added one further paragraph:

"2. Any terms of paragraph 6 of the Agreement notwithstanding you shall be the sole and exclusive distributor within the United States of America of briar pipes manufactured by us so long as you shall purchase the requirements of pipes set forth in paragraphs 5 and 10 of the Agreement."

Thereafter the parties began to perform under the contract. It is undisputed that the defendants purchased briar pipes in the following amounts:

| | |
|---|---|
| 1971 | $ 3,321.22 |
| 1972 | 4,945.60 |
| 1973 | 69,113.36 |
| 1974 | 11,671.96 |
| Total | $89,052.14 |

In October of 1974 Orlik sent the defendants a letter dated "9th October, 1974" stating that the defendants had "not carried out [their] obligations under this Contract," and giving notice of termination to be effective on October 31, 1975.

The plaintiff contends that the failure of the defendants to purchase the minimum amounts required by the 1970 Agreement was a breach thereof leading to substantial damages consisting of profits lost by the plaintiff on those sales. The defendants contend that the 1970 Agreement is ambiguous as to time periods covered and that, pursuant to the paragraph added in the 1971 Agreement, should be regarded as having terminated upon the failure of defendants to order the required amount in the first year of the contract. The defendants further contend that the plaintiff waived its right to enforce the minimum purchase requirement. Finally, they argue that even if liability is found, the applicable law leads to the conclusion that the plaintiff did not incur any damages.

---

2. Paragraph 10 of the 1970 Agreement stated: "10. The turnover figures in Clause 5 of this contract represent U.S. $96,000 and U.S. $28,800 respectively."

■ The applicable law in this case is that of England.[3] The contract contains an explicit choice-of-law clause specifying that the "contract shall be covered by English law." (1970 Agreement ¶ 9). This clause settles the question since the defendants' purchase in England of the plaintiff's briar pipes provides a "reasonable relation" between this transaction and England, thus validating the clause under New York law. N.Y.U.C.C. § 1–105(1); *see Fleischman Distilling Corp. v. Distillers Co. Ltd.*, 395 F.Supp. 221, 229 (S.D.N.Y.1975).

### Construction of Contract

With respect to the construction of contracts, the law of England is essentially similar to the basic law of contracts in the United States. As Lord Hailsham states:

"The object of all interpretation of a written instrument is to discover the real intention of the author, the written declaration of whose mind it is always considered to be. . . .

. . . . .

"The intention must be gathered from the written instrument read in the light of such extrinsic evidence as is admissible for the purpose of construction. . . ." 12 *Halsbury's Laws of England* ¶¶ 1459–60 (4th ed. Lord Hailsham of St. Marylebone 1975) (footnotes omitted).

He adds:

"[S]ince the words are the sole guide to the intention, extrinsic evidence of that intention is not admissible, save in the case of a latent ambiguity which cannot otherwise be resolved." *Id.* ¶ 1490 (footnotes omitted).

■ The agreements at issue in this case, while not models of linguistic precision, are sufficiently unambiguous to be capable of being interpreted without resort to extrinsic evidence. On the issue of the length of the contract, the following language governs:

"6. The term of this contract is for a definite period of four years. Thereafter the contract will be renewable on a yearly basis for a period of ten years but may be terminated by you [defendants] on sixty days notice expiring on the 31st October 1972 and in any succeeding year and may be terminated by us [Orlik] on twelve months notice to you expiring on the 31st October 1974 and in any succeeding year."

The contract states that it is "renewable" but gives no mechanism for renewal; it does, however, give a mechanism for termination. The clear meaning of this language is that the contract is automatically renewable unless one of the parties takes the specific action of terminating it in conformity with the specific notice requirements.

The affirmative act of termination called for by the contract was taken by Orlik by its letter dated October 9, 1974 and effective October 31, 1975. The defendants thereby received the one-year's notice required by the contract. Thus, the contract began in October of 1970 and ended in October of 1975, a total term of five years. The Court further concludes that the parties intended a year running from October to October rather than according to the normal calendar to be the "per annum" referred to in Paragraph 5 of the contract. The obligation of the defendants, therefore, was to purchase $28,800 worth of assorted briar pipes in the year 10/70 to 10/71, and $96,000 worth of pipes in each of the four final years of the contract: 10/71 to 10/72,

---

**3.** This Court, sitting in diversity jurisdiction, must look to the law of New York State for choice-of-law principles. *Klaxon Co. v. Stentor Electric Mfr. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

With respect to pleading and practice, however, federal rules govern. Under Rule 44.1 of the Federal Rules of Civil Procedure ("Rules"), "[t]he court's determination [of foreign law] shall be treated as a ruling on a question of law." Thus, any dispute over the interpretation of English law in this case does not concern a material *fact* within the meaning of Rule 56 and does not prevent summary judgment. Furthermore, there is no barrier to the application of English law in the instant case since the requirements of Rule 44.1 have been met. The plaintiff gave notice of its intention to raise English law. (Complaint ¶ 14). Both parties briefed the legal issues with respect to English law, and the Court has supplemented these presentations with its own research.

10/72 to 10/73, 10/73 to 10/74, and 10/74 to 10/75.

### Liability

These undisputed facts, when coupled with the Court's conclusions as to the meaning of the contract, would require the grant of summary judgment. The defendants set up several affirmative defenses, however, which they claim are complete defenses to this action. The first of these is waiver. The defendants contend that during the life of the contract the plaintiff failed to discuss the minimum purchase requirement or to press for greater purchases and in fact expressed pleasure with the defendants' purchases. They also contend that the plaintiff was aware that the defendants had purchased Whitehall's inventory of Orlik pipes at a cost of $627,000 and were attempting to distribute this inventory, thus "building Orlik's reputation in the United States." (Feaser Affidavit ¶ 11). Finally, they allege that Orlik had been unable to fill $9,000 worth of defendants' orders due to Orlik's production problems. If these elements are taken together, the defendants argue, they amount to a waiver of the plaintiff's right to enforce the minimum purchase requirements term of the contract and therefore relieve the defendants of any liability for failing to make such purchases.[4]

The defendants base their argument on the still-developing English doctrine of waiver. They quote the following passage from the Court of Appeal case of *W. J. Alan & Co. v. El Nasr Export & Import Co.,* [1972] 2 All E.R. 127, 139–40 (C.A.) (Lord Denning, M.R.):

"The principle of waiver is simply this: if one party, by his conduct, leads another to believe that the strict rights arising under the contract will not be insisted on, intending that the other should act on that belief and he does act on it, then the first party will not afterwards be allowed to insist on the strict legal rights when it would be inequitable for him to do so: see *Plasticmoda Societa Per Azioni v. Davidsons (Manchester) Ltd.* There may be no consideration moving from him who benefits by the waiver. There may be no detriment to him by acting on it. There may be nothing in writing. Nevertheless, the one who waives his strict rights cannot afterwards insist on them. His strict rights are at any rate suspended so long as the waiver lasts. He may on occasion be able to revert to his strict legal rights for the future by giving reasonable notice in that behalf, or otherwise making it plain by his conduct that he will thereafter insist on them: see *Tool Metal Manufacturing Co Ltd v Tungsten Electric Co Ltd.* But there are cases where no withdrawal is possible. It may be too late to withdraw; or it cannot be done without injustice to the other party. In that event he is bound by his waiver. He will not be allowed to revert to his strict legal rights. He can only enforce them subject to the waiver he had made.

"Instances of these principles are ready to hand in contracts for the sale of goods. A seller may, by his conduct, lead the buyer to believe that he is not insisting on the stipulated time for exercising an option: see *Bruner v Moore.* A buyer may, by requesting delivery, lead the seller to believe that he is not insisting on the contractual time for delivery: see *Charles Rickards Ltd v Oppenheim.* A seller may, by his conduct, lead the buyer to believe that he will not insist on a confirmed letter of credit: see *Plasticmoda,* but will accept an unconfirmed one instead: see *Panoutsos v Raymond Hadley Corp'n of New York* and *Enrico Furst v Fischer.* A seller may accept a less sum for his goods than the contracted price, thus inducing him to believe that he will not enforce payment of the balance: see *Central London Property Trust Ltd v High Trees House Ltd* and *D&C Builders Ltd v Rees.* In none of these cases does

---

4. The defendants also argue that they were induced not to exercise their right to terminate the contract under paragraph 6, thus suffering a detriment in reliance on the plaintiff's ac-
tions. The doctrine of waiver does not require such a detriment, however, as is made clear in the text.

the party who acts on the belief suffer any detriment. It is not a detriment, but a benefit to him, to have an extension of time or to pay less, or as the case may be. Nevertheless, he has conducted his affairs on the basis that he has that benefit and it would not be equitable now to deprive him of it." (Citations omitted).

An examination of the line of cases cited in *W. J. Alan & Co.* and other relevant English law reveals, however, that even if the defendants' factual allegations are accepted as true, the plaintiff's actions fall short of a waiver of the minimum purchase requirements of the contract. Basically, waiver is an equitable principle, used by the court to avoid a harsh result when the parties have conducted themselves in such a way as to make that result unfair. It serves to prevent a party from insisting on a right upon which he could have insisted earlier but has been found to have surrendered.

The facts of *W. J. Alan & Co.* illustrate the principle. The plaintiff, a seller of coffee in Nairobi, Kenya, had a contract with the defendant, an Egyptian coffee buyer, which called for a confirmed, irrevocable letter of credit to be opened for the purchase price of two shipments of coffee. The contract specified the price as "Shs.262/–" per hundredweight. The actual letter of credit was opened in pounds sterling and was accepted by the sellers and honored by the originating bank. Although the court concluded that the parties intended Kenyan shillings rather than pounds sterling to be the currency of amount for this transaction, it found that the plaintiff, by actually accepting the nonconforming letter of credit, had waived its right to insist on a letter of credit opened in Kenyan shillings according to the strict terms of the contract.

In the case at bar, the defendants have failed to allege any conduct on the part of the plaintiff which, when examined in the light most favorable to the defendants, can be found reasonably to have induced conduct on the defendants' part which now

makes it inequitable to enforce the contract's minimum purchase requirement. The only affirmative conduct to which the defendants can point is Orlik's expression of approval of the defendants' purchases at various times during the life of the contract. Such conduct is at best ambiguous and could not have supported a rational belief that the plaintiff was no longer insisting on the minimum purchase requirement. *See Woodhouse Ltd. v. Nigerian Produce Ltd.,* [1972] All E.R. 271, 280–82 (H.L.) (Lord Hailsham). Unlike the act of the plaintiff seller in *W. J. Alan & Co.,* Orlik's conduct here is not at all inconsistent with a belief in the continuing validity of the clause which is the subject of the alleged waiver. The other behavior cited by the defendants is even less supportive of the defendants' argument. Certainly the alleged failure to insist on greater purchases can in no way support a waiver. In *Plasticmoda Societa per Anzioni v. Davidsons (Manchester) Ltd.,* [1952] Lloyd's List L.R. 527, 536 (C.A.), Singleton J. found that even where one party had specifically inquired whether the other party was going to insist on exact compliance with a contract the lack of a response could not be found to constitute a waiver. Rather, Singleton J. based his finding of a waiver on an actual affirmative agreement between the parties as evidenced by a conversation. *Id.* Nothing approaching such an agreement is alleged here.

In all of the waiver cases, the conduct constituting the waiver was far clearer than that relied on in this case. For example, in *Charles Rickards, Ltd. v. Oppenheim,* [1950] 1 All E.R. 420, 422 (C.A.) (Denning L.J.), the buyer of an automobile was found to have waived a time-is-of-the-essence clause by continuing to ask for delivery after the time stated in the contract had passed.

Moreover, in none of the waiver cases was a term as fundamental as the minimum purchase requirement at issue. Most often the term waived was a condition precedent. Two cases cited by the Master of the Rolls

in *W. J. Alan & Co.* are said to stand for the proposition that a price term can be waived. *W. J. Alan & Co. v. El Nasr Export & Import Co., supra,* [1972] 2 All E.R. at 140. In *Central London Property Trust Ltd. v. High Trees House Ltd.,* [1947] 1 K.B. 130 (1946) (Denning J.), the modern progenitor of the principle of waiver, the parties had entered into an actual *written* agreement for the reduction of the money term of a lease due to the adverse economic conditions of World War II London. Waiver was used as a means of getting around the problem of lack of consideration for the rent reduction, and an obvious inequity was avoided. In the other case, *D & C Builders Ltd. v. Rees,* [1965] 3 All E.R. 837 (C.A.) (Lord Denning, M.R.), the principle of waiver was raised but found inapplicable by the Master of the Rolls.

Indeed, it would seem to cast the whole of the law of contract into doubt if one party were able to avoid its most material and fundamental obligation under a contract simply by alleging that the other party had failed to discuss that obligation during the term of the contract. The English courts have recognized this point in their comments on waiver in the context of a fundamental breach of the contract:

> "[T]his expression ['fundamental breach'] is no more than a convenient shorthand expression for saying that a particular breach or breaches of contract by one party is or are such as to go to the root of the contract which entitles the other party to treat such breach or breaches as a repudiation of the whole contract. Whether such breach or breaches do constitute a fundamental breach depends on the construction of the contract and on all the facts and circumstances of the case. The innocent party may accept that breach or those breaches as a repudi-

ation and treat the whole contract at an end and sue for damages generally *or he may at his option prefer to affirm the contract and treat it as continuing on foot in which case he can sue only for damages for breach or breaches of the particular stipulation or stipulations in the contract which has or have been broken.*" *Suisse Atlantique Societe d'Armement Maritime S.A. v. N.V. Rotterdamsche Kolen Centrale,* [1967] A.C. 361, 421–22 (H.L.1966) (Lord Upjohn) (emphasis added).

In this case, the defendants' obligation to purchase a minimum amount of briar pipes each year went "to the root of the contract." When the defendants failed to perform, the plaintiff had the option of treating the contract as at an end or affirming it and continuing to operate under it. That they did the latter is amply clear from all the affidavits before the Court. Thus they can be said to have waived only their right to have cancelled the contract in response to the defendants' fundamental breach. Under these circumstances the entire contract was preserved and thus forms the basis for this action.[5]

■ The defendants have raised certain other defenses which may be treated briefly. First, they argue that the contract actually terminated at the end of the first year. They base this argument on the paragraph added in the 1971 Agreement to the effect that the defendants would remain the sole and exclusive distributors of Orlik pipes in the United States "so long as [they] purchase the requirements of pipes" set forth in the contract. Even if this clause were susceptible to interpretation as an automatic termination clause, which this Court doubts, the conduct of the parties in continuing to perform under the contract for years after 1971 would certainly qualify

---

5. If the conduct or communications of the parties had indicated at least an apparent meeting of the minds on the abandonment of the minimum purchase requirement term of the contract, and if some consideration for this modification had been present, the contract could have been found to have been reformed, since contracts for the sale of goods are no longer

within any English statute of frauds. 34 *Halsbury's Laws of England* ¶ 38 (3d ed. Viscount Simonds 1960); *see* 9 *id.* ¶ 226 (4th ed. Lord Hailsham of St. Marylebone 1974). However, conduct too ambiguous to support a waiver cannot support a variation. *See Woodhouse Ltd. v. Nigerian Produce Ltd., supra,* [1972] 2 All E.R. at 282 (Lord Hailsham).

as a waiver of automatic termination under the principles discussed above.[6]

 Second, the defendants also argue that the inability of the plaintiff to fill some ·$9,000 worth of orders during the contract was a breach of the plaintiff's obligation to use its "best endeavours" to supply the defendants' requirements (1970 Agreement ¶ 2) and that this breach prevents the plaintiff from maintaining this action. Under English law, however, a breach will constitute a bar to an action only if the duty breached was a condition of performance by the other party. 9 *Halsbury's Laws of England, supra,* ¶ 510. The duty to use "best endeavours" was not a condition precedent to the defendants' performance nor would a breach of that duty of the magnitude alleged here have given the defendants a right to rescind the contract. *See id.* ¶ 542. The failure ·to fill orders may be relevant to the question of damages, however. Similarly, the defendants state that the plaintiff's failure to tender the minimum amount of pipes bars the action. However, this Court can find no such principle in English law.

 Third, the defendants maintain that they were prevented from performing any minimum purchase obligation in the fifth year of the contract (1975) when the plaintiff offered its pipes at a price far above the maximum permitted by the contract. With respect to this point, however, defendants' affidavit is submitted only upon information and belief. Thus, it fails to satisfy Rule 56(e) of the Federal ·Rules ·of Civil Procedure ("Rules"), which requires affidavits to be made "on personal knowledge." Furthermore, the defendants' allegation is directly refuted by plaintiff's reply affidavit and documents which accompany it. The Court must conclude that the prices proposed by the plaintiffs in 1975 did not exceed those required by the contract.

 Finally, the defendants contend that summary judgment should be denied because the defendants had not yet conducted pretrial discovery on the issue of waiver. Defendants' Memorandum of Law at 12. The defendants have not satisfied Rule 56(f), however, which requires the party opposing a motion for summary judgment to state reasons why he cannot present facts essential to justify his opposition. The issue on which the defendants seek discovery is waiver, and facts concerning this issue must, by their very nature, be facts within the knowledge and control· of the defendants. Only they are in a position to describe any and all conduct of the plaintiff upon which they relied and which constitutes the waiver in question. Conduct which is unknown to them, and thus which would have to be discovered, is conduct upon which they could not have relied in any way.

*Damages*

 Although summary judgment has been granted as to liability, no such determination is possible with respect to damages. The parties have put forward two mutually exclusive rules, each alleged to provide the measure of damages in this action. While it is clear that one of them must govern, the Court cannot determine which is applicable without further factual inquiry. Thus, this case is referred to United States Magistrate Nina Gershon for an inquest on damages in accordance with the law as set forth below.

It is not disputed that Section 50 of the Sale of Goods Act, 1893, 56 & 57 Vict. ch. 71, states the relevant English ·law. That statute provides:

"(1) Where the buyer wrongfully neglects or refuses to accept and pay for the goods, the seller may maintain an action against him for damages for nonacceptance.

"(2) The measure of damages is the estimated loss directly and naturally resulting, in the ordinary course of events, from the buyer's breach of contract.

---

**6.** Since the plaintiff's ambiguous conduct could not rationally be found to constitute a waiver, neither can it be found to have induced the defendants not to exercise their right to terminate the contract. *See* note 4 *supra.*

"(3) Where there is an available market for the goods in question the measure of damages is prima facie to be ascertained by the difference between the contract price and the market or current price at the time or times when the goods ought to have been accepted, or, if no time was fixed for acceptance, then at the time of the refusal to accept."

The Court is thus faced with two possible rules: that of section 50(3), urged by the defendants, which looks to a simple arithmetical calculation and which could well result in nominal damages or no damages at all,[7] and that of section 50(2), urged by the plaintiff, which would allow the Court to compensate the plaintiff for all loss "directly and naturally resulting" from the defendants' breach—including, in particular, the loss of profit to the seller.

A reading of the statute would seem to indicate that its correct application requires a two-step inquiry, the first step being the determination of the presence or absence of an "available market." An examination of the cases indicates, however, that the English courts have failed to develop a commonly accepted definition of this term. See Robbins of Putney Ltd. v. Meek, [1971] R.T.R. 345, 347–48 (Q.B.D.1970) (Stephenson, J.); compare Thompson (W.L.) Ld. v. Robinson (Gunmakers) Ld., [1955] Ch. 177, 183–88 (1954) (Upjohn J.) with Charter v. Sullivan, [1957] 2 Q.B. 117, 126–28 (C.A.) (Jenkins L.J.). Nevertheless, the English cases and commentaries also reveal that the first step of the bifurcated inquiry may be unnecessary and that a unitary investigation concentrating on market conditions provides both a means of selecting the proper section as well as a standard to judge whether the plaintiff is entitled to receive lost profits under section 50(2). H. McGregor, Mayne & McGregor on Damages ¶ 425(a), at 384 (12th ed. 1961).

The basic questions to be asked are two: (1) whether the demand for the goods in question was greater or less than the supply of those goods at the appropriate times and (2) whether those goods could have been freely sold. See 2 Chitty on Contracts ¶ 1628 (23d ed. 1968). For example, if demand exceeded supply, then it could be said that there was an available market, section 50(3) would apply, and the plaintiff would not be allowed to recover lost profits. If, however, the court was unable to use section 50(3) because it felt bound by a narrow definition of "available market," see Thompson (W.L.) Ld. v. Robinson (Gunmakers) Ld., supra, [1955] Ch. at 185–87, it could still be concluded, under section 50(2), that the plaintiff was not entitled to lost profits since it could easily have disposed of the goods.

Two leading cases illustrate this general principle; both involved the sale of automobiles. In the Thompson case, Upjohn J., applying section 50(2), found the seller entitled to lost profits since the supply for the type of automobile in question exceeded the demand. Under these market conditions, the judge found, "[i]f a purchaser defaults, that sale is lost, and there is no means of readily disposing" of the car. Id. at 187. In Charter v. Sullivan, supra, however, Jenkins L.J., also applying section 50(2), found the seller not entitled to lost profits where demand exceeded supply:

"If the state of the trade were such that the plaintiff could sell at the fixed retail price all the cars he could get, so that the defendant's default did not result in the plaintiff effecting one sale less than he would otherwise have effected, it may well be that the plaintiff could not make out his claim to anything more than nominal damages." [1957] 2 Q.B. at 125–26; accord, id. at 134–35 (Sellers L.J.).

In applying this test to the case at bar, it must first be noted that the defendants' breach caused the plaintiff to lose all sales to the American market for the years in which the contract was in force. The

---

**7.** The contract required the plaintiff to sell to the defendant

"at a price no greater than the last bona fide export price at which [Orlick had] sold to any other accounts or at the price which [Orlick is] then offering such merchandise to other export accounts whichever is lower." (¶ 3) (emphasis added).

Court concludes that this fact constitutes prima facie proof that the demand for plaintiff's goods fell below supply. Thus, the burden will fall on the defendants to establish that, notwithstanding the loss of the American market, there was ample demand for the plaintiff's briar pipes such that total demand exceeded supply. If the defendant can show that the plaintiff easily could have sold or actually did sell his full capacity of briar pipes in the contract years, then plaintiff will not be entitled to lost profits. If, however, it continues to appear that the plaintiff was unable to compensate for the loss of the American market, then the defendants' breach did "result in the plaintiff effecting one sale less than he would otherwise have effected," and the plaintiff is entitled to recover his lost profit. This allocation of the burden of proof is in keeping with the well-established rule "that the burden of proof that the plaintiffs failed to mitigate their loss is on the defendants." *Robbins of Putney Ltd. v. Meek, supra,* [1971] R.T.R. at 348.[8]

Two older English cases support this conclusion. In *Hill & Sons v. Edwin Showell & Sons, Lim.,* [1918] 87 L.J.K.B. 1106, the House of Lords concluded that the trial judge should have allowed the defendant's counsel to inquire whether the defendant's failure to purchase steel cartridge clips enabled the plaintiff to perform other profitable contracts, thus mitigating the plaintiff's loss. Similarly, in *In re Vic Mill, Ltd.,* [1913] 1 Ch. 465 (C.A.1909), the Court of Appeal considered whether the seller made profits which could not have been made if the seller had been forced to perform under the contract breached by the buyer. Hamilton L.J. stated: "The evidence on the affidavits fairly taken is evidence that the claimants' works were sufficiently large and their equipment sufficiently ample to have enabled them to perform this contract in addition to all the other that they did perform." *Id.* at 472.

If lost profits is found to be the proper measure of damages, then it will be necessary to determine exactly what is meant by "lost profits." In *Hill & Sons v. Edwin Showell & Sons, Lim., supra,* [1918] 87 L.J. K.B. 1106, the Lord Chancellor seemed to accept as the measure of profits lost by a manufacturer "the excess of contract price over what would have been the cost to the plaintiffs of making the clips." *Id.* at 1106. In the *Thompson* and *Charter* cases, the judges appear to have considered the term to mean the difference between cost and selling price. In both cases the sellers were car dealers, and the profits in question were calculated as the difference between the cost of the car to the dealer and the price at which it was to be sold to the buyer. In the absence of further proof of applicable English precedent, the measure of profit in this case will likewise be the difference between the cost of production to the plaintiff of the briar pipes and the price at which they were to be sold to the defendants.

For the reasons stated above, the plaintiff's motion for summary judgment is granted and summary judgment on the issue of liability is awarded to the plaintiff. Summary judgment on damages is denied, and the case is referred to United States Magistrate Nina Gershon for an inquest on damages according to the law stated above.

So ordered.

---

8. The defendants may also introduce evidence that the plaintiff failed without just cause to fill $9,000 worth of orders during the contract period. Since the obligation of the defendants was to purchase briar pipes, a showing that the defendants attempted to purchase a certain amount of pipes but were prevented from actually completing such purchases by the actions of the plaintiff would relieve the defendants from liability to the extent of such orders.